UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                                    )
SUSAN O'HORO, M.D.,                               )
                                                                    )
                  Plaintiff,                                   )
                                                                    )
v.                                                                 )
                                                                    )
BOSTON MEDICAL CENTER CORP.;          )
BOSTON UNIVERSITY MEDICAL CENTER   )
RADIOLOGISTS, INC.; and                          )
JORGE SOTO, M.D.,                                   )
                                                                    )
                  Defendants.                             )
_____ )

## COMPLAINT AND JURY DEMAND

### Introduction

1.      The plaintiff in this case, Susan Kiernan O'Horo, M.D., MPH, FSIR, is an

Interventional Radiologist who has devoted her career to advocating for quality care and patient

safety in her field.  She has taken on leadership roles within organizations which strive to

improve patient outcomes and physician practices in Interventional Radiology throughout the

Commonwealth, New England and nationally.  When Dr. O'Horo was hired by Boston Medical

Center ("BMC"), New England's largest safety-net hospital, to turn around serious safety

concerns within the Interventional Radiology division, she wholeheartedly believed that she had

the opportunity to improve the lives of some of Boston's most vulnerable.  Instead, she was met

with gender-based critiques about her technical skills, discriminatory treatment, questions about

her "emotional intelligence," and, ultimately, retaliation for expressing her concerns about a

physician who was harming his patients.

2.      Dr. O'Horo was the only woman in the Division of Interventional Radiology. Almost from the outset of her employment, she was treated differently than her male counterparts: they were given opportunities for advancement and international scholarship that were never provided to Dr. O'Horo.  The schedule was manipulated in ways that benefited her male colleagues—a classic technique for retaliating against those perceived to be troublemakers. Her technical skills were unfairly questioned and she was unjustifiably undermined in front of residents and staff.  Most egregiously, Dr. O'Horo's patient safety concerns were ignored because she was viewed as a hysterical woman who lacked "emotional intelligence".

3.      Indeed, within a few months after she began working at BMC, it became clear that one junior physician within the department, Dr. Mikhail Higgins, was engaging in behavior which was jeopardizing patient safety. The plaintiff personally witnessed multiple serious reportable events ("SREs"), otherwise known as "never events," causing harm to patients. To take only a few examples of many, Dr. Higgins placed the incorrect device in a developmentally delayed teenage patient, who needed that port for treatment of a chronic disease; fractured needles off during biopsies requiring surgery to remove; biopsied incorrect sites; and ruptured multiple blood vessels. In addition, he had a higher complication rate for basic procedures compared to his colleagues and made mistakes identifying basic radiological findings which in at least one case resulted in the patient's death.  Dr. Higgins also behaved in a condescending and demeaning way toward female colleagues and subordinates. Despite Dr. O'Horo's specific and credible reports of Dr. Higgins' clinical incompetence, nothing was done. And despite his well-known behavioral issues, nothing was done by Dr. Soto to prevent Dr. Higgins from harming patients  and acting in a discriminatory manner towards female co-workers.  As time went on and Dr, O'Horo continued to hear from other women in the division that Dr. Soto's  treatment of

2

them was similarly condescending and demeaning and that their concerns had also been ignored, she realized that her gender was one of the major reasons why BMC's leadership was not taking her safety concerns seriously.

4. Still, she persisted.  Dr. O'Horo, as part of her job as the hospital's Director of Quality and Safety, developed a plan to objectively review all of the junior physicians in the division—the problem physician included. This plan was developed at the behest of Dr. Soto and hospital leadership.  When it became clear that Dr. Higgins, who was not even a Board Certified Interventional Radiologist,  was not meeting expectations, she discussed this with the department chair, Dr Jorge Soto who did everything in his power to protect Dr. Higgins, notwithstanding his failure to meet minimum objective standards of competence.  He repeatedly told Dr. O'Horo not to put her safety concerns in writing, he reprimanded her when she did, and on one occasion, he came running, breathless, to prevent her from filing a report in the hospital risk management database documenting a serious incident wherein Dr. Higgins had harmed a patient through an incorrect catheter placement. In short, he did everything he could to protect this male physician, while telling others in the department and in the hospital's leadership that Dr. O'Horo lacked "emotional intelligence," painting her to be some hysterical woman who was not behaving rationally by expressing her genuine concerns for patient safety.

5. Frustrated by her department chair's obstinance, in January 2019, she went above him to the hospital's Vice President for Quality and Safety, Dr. James Moses, to no avail. Dr. Higgins continued to harm patients, including errors so egregious that Dr. O'Horo had never before seen them in her 16 years of reviewing complications in Interventional Radiology.  Dr. O'Horo continued to sound the alarm, but nothing was done.  After many months of witnessing harm come to patients again and againand no action by hospital leadership to intervene, in

3

September 2019 she brought her complaints to the next rung in the ladder—reaching out directly to the hospital's Chief Medical Officer, Dr. Ravin Davidoff, by sending a letter and citing to the Massachusetts Medical Whistleblower Statute, M. G. L. c. 149, § 187.  Still, the hospital delayed further, and patients continued to be harmed.  Each time she raised a safety concern, more and more of her job duties were stripped away, she was demeaned and was targeted for continuing to report safety concerns about Dr. Higgins.

6.      Horrified, Dr. O'Horo realized that a single, dangerous physician was not the only problem: the hospital had created a culture of silence, where quality and safety concerns fell on deaf ears—especially when those concerns were voiced by women—and were met with resistance and, even worse, retaliation.  Without any other recourse within the hospital, Dr. O'Horo was compelled to report her concerns about the hospital and the physician to the Department of Public Health and Board of Registration in Medicine.  By this point, a Quality and Safety Director in title only and isolated from the others in her division and Department, the hospital had essentially fired her. Through this complaint, Dr. O'Horo seeks to recover damages for the discriminatory and retaliatory treatment she suffered and for her wrongful constructive termination.

**<u>Parties</u>**

7.      Dr. O'Horo is a natural person with a residence in Hingham, Massachusetts.  She is a board-certified practicing Interventional Radiologist.  She was previously employed by Boston University Medical Center Radiologists, Inc., and held privileges at Boston Medical Center until January 2020.

8.      Boston Medical Center Corporation ("BMC") is a non-profit medical center with a primary place of business located at One Boston Medical Center Place, Boston, MA 02118.  It

is the largest safety-net hospital (i.e., a hospital with a substantial portion of uninsured patients and patients with insurance through government programs like Medicare and Medicaid, and which often serve other low-income and vulnerable populations) and Level I trauma center in New England.  In addition to treating many low-income and underserved populations, nearly a third of BMC's patients do not speak English as a primary language.  BMC's patients are some of the most vulnerable in our society.

9.      Boston University Medical Center Radiologists, Inc., ("BUMC – Radiologists") is the non-profit corporation which directly employs physicians for the Department of Radiology at Boston University School of Medicine and Boston Medical Center.  BUMC—Radiologists' primary place of business is located at One Boston Medical Center Place, Boston, MA 02118. Jorge Soto, M.D., is the president of BUMC—Radiologists.

10.      Jorge Soto, M.D., is the president of BUMC—Radiologists, and the Chair of the Radiology Department at BMC.  At all times relevant, Dr. Soto was Dr. O'Horo's supervisor.

**Jurisdiction and Venue**

11.      This Court has jurisdiction of the action under 42 U.S.C. § 2000e-5(f). Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) because it is where a substantial part of the events or omissions giving rise to the cause of action herein occurred.

12.      The Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") each received a timely charge filed by Dr. O'Horo on or about August 20, 2020.  In her charge, Dr. O'Horo alleged that she had been discriminated against based on her gender by her supervisors and coworkers.  Dr. O'Horo timely requested and has received right to sue letters from both the MCAD and EEOC.  Thus, all conditions precedent to the filing of suit have been performed or have occurred.

**Facts**

I.     **DR. O'HORO: AN EXPERIENCED INTERVENTIONAL RADIOLOGIST COMMITTED TO PATIENT SAFETY**

13.     Dr. O'Horo is a practicing Interventional Radiologist, with nearly two decades of experience, who has committed her career to advancing patient safety within the field of Interventional Radiology and mentoring medical students, residents and fellows, especially female trainees, interested in a career in interventional radiology.

14.     She is a Board-Certified Diplomate of the American Board of Radiology specializing in both Interventional Radiology and Diagnostic Radiology, a Fellow of the Society of Interventional Radiology, and was a Clinical Associate Professor of Radiology at Boston University School of Medicine.  Fellowship in the Society of Interventional Radiology is one of the most prestigious honors granted to a practicing Interventional Radiologist.  Indeed, less than ten per cent of all Interventional Radiologists hold the distinction and Dr. O'Horo was the only Interventional Radiologist at BMC with that honor during her tenure.  Fellowship in the Society of Interventional Radiology is awarded "based on outstanding credentials, achievements and community contributions to interventional radiology and [the Society of Interventional Radiology] and [the Society of Interventional Radiology] Foundation, those who are elected to Fellowship signal to peers and patients their commitment to quality [Interventional Radiology] care."[1]  She has trained over 50 Interventional Radiology fellows and innumerable Radiology residents.

---

[1] https://www.sirweb.org/member-central/join-now/sir-fellowship-a/

15.     Additionally, Dr. O'Horo is a past-president and has served on the Board of Directors for the New England Society of Interventional Radiology and she currently serves on the Massachusetts Radiological Society Quality and Safety Council.

16.     Throughout her career, Dr. O'Horo has been advocate for women in interventional radiology.  Indeed, Dr. O'Horo is a member of the Society of Interventional Radiology – Women in Interventional Radiology Section, and she has published and lectured on women's issues in interventional radiology.

17.     Dr. O'Horo has trained and closely mentored over 50 Interventional Radiology fellows and innumerable Radiology residents.  In her prior job at Brigham & Women's Hospital, Dr. O'Horo also served on the Residency Admissions Committee and organized the lecture series for residents accepted into that program.  For seven years from 2006 to 2013, Dr. O'Horo gave monthly lectures to third- and fourth- year medical students at Harvard Medical School regarding introductory topics to interventional radiology.

18.     Prior to her employment with BMC, Dr. O'Horo was the Morbidity and Mortality Director of Interventional Radiology at Brigham and Women's Hospital from 2005 to 2018.  In that role, she was responsible for analyzing every complication which occurred in that division, organizing regular conferences to discuss complications, and implementing evidence-based quality improvements and patient safety initiatives.  She also served as the Chair of the Radiation Safety Committee at Brigham and Women's Hospital from 2015 through 2018.  In that capacity, Dr. O'Horo worked to ensure Brigham and Women's Hospital's compliance with the standards set by the Massachusetts Department of Public Health ("DPH") and the Joint Commission on Accreditation of Healthcare Organizations (the "Joint Commission"), a non-profit organization responsible for accrediting healthcare organizations throughout the country.

## II.      DR. O'HORO'S EMPLOYMENT WITH BMC.

19.      In the fall of 2017, Dr. O'Horo interviewed for the position of Director of Quality and Safety in Interventional Radiology at BMC.  Initially, the Chair of the Radiology Department, Dr. Jorge Soto, led Dr. O'Horo to believe that she was actually interviewing for the position of Chief of the Division of Interventional Radiology.

20.      During the interview process, Dr. Soto told her that he was given a mandate from hospital leadership to fix quality and safety issues within Interventional Radiology.

21.      Dr. O'Horo later came to find out that Dr. Soto was keeping the then-current division chief, Dr. Rajendran Vilvendhan, in that position, despite his apparent dissatisfaction with Dr. Vilvendhan's performance.

22.      Unsurprisingly, more men than women occupy leadership roles within the Department of Radiology—the department Dr. Soto oversees.

23.      When Dr. O'Horo found out that Dr. Vilvendhan would be remaining as Chief of the Division, Dr. Soto explained to Dr. O'Horo that the position of Director of Quality and Safety in Interventional Radiology was superior to the Chief of the Division of Interventional Radiology because the Chief of the Division of Interventional Radiology was required to report to, and follow the directions of, the Director of Quality and Safety with respect quality and safety initiatives instituted in the division.

24.      Prior to accepting the position of Director of Quality and Safety in Interventional Radiology, Dr. O'Horo recommended and requested that the hospital purchase HIIQ, standard software used to perform complications analysis designed specifically for tracking interventional radiology cases, because BMC did not have any database to track outcomes within Interventional Radiology.

25.     Dr. O'Horo began as the Director of Quality and Safety in Interventional Radiology at BMC in February 2018.  In that role, Dr. O'Horo was responsible for implementing quality and safety initiatives and procedures in order to make division-wide improvements to the culture of safety within the Interventional Radiology Division at BMC.

26.     In addition to her work as Director of Quality and Safety in Interventional Radiology, Dr. O'Horo performed regular duties as a practicing interventional radiologist at BMC.  She was the only female interventional radiologist in the department.

27.     After she had already started working, BMC told Dr. O'Horo that it would not purchase the HIIQ software, despite her request.  Dr. O'Horo was deeply troubled by and raised concerns about BMC's refusal to purchase HIIQ because she believed that such software—which facilitated the tracking of each complication and provided a mechanism to track the entire population at risk of such complications—was critical to creating a division-wide focus on patient safety.

### III.     DR. O'HORO OBSERVED SERIOUS QUALITY CARE DEFICIENCIES SURROUNDING A SPECIFIC PHYSICIAN.

28.     Within the first two weeks of her employment at BMC, Dr. Vilvendhan—the Division Chief of Interventional Radiology—reached out to her to report an "ongoing safety issue" concerning one of the junior attending physicians, Dr. Mikhail Higgins.

29.     Dr. O'Horo was determined to give Dr. Higgins the benefit of the doubt and attempted to help correct the safety issues that were raised.

30.     In the ensuing months, Dr. O'Horo received numerous complaints from other physicians, residents, nurses, and technologists about Dr. Higgins and his technical abilities.

31.     In April 2018, Dr. O'Horo herself observed a troubling incident which made her question Dr. Higgins' technical abilities and clinical competence.  Dr. Higgins biopsied a

patient's duodenum, when he should have biopsied the lymph node on the opposite side.  Not only did he biopsy the wrong site, but the patient's duodenum was perforated following the procedure and the patient was required to be admitted to the hospital for several days.  The performance of this invasive procedure on the wrong site likely constituted a Serious Reportable Event ("SRE"), as defined by federal and state regulations and should have been reported by the hospital to the DPH.

32.     Dr. O'Horo raised concerns about this incident directly to Dr. Soto.

33.     Although the case was presented at the Morbidity and Mortality Conference[2], Dr. Higgins dismissed the complication as a "perceptual error"—ignoring that his so-called "perceptual error" still constituted a SRE that caused harm to the patient—and Dr. Soto elected not to have the matter further reviewed.

34.     Around this time, Dr. O'Horo became aware that several surgeons at BMC were referring to Dr. Higgins as the "Boston Butcher".

35.     As time went on, Dr. O'Horo also heard from multiple female staff members that Dr. Higgins had behaved in an unprofessional, condescending and rude manner toward them, and would often ignore their concerns about patient care issues.  Not only were such complaints worrying from a safety perspective, but Dr. O'Horo was also alarmed by her colleague's treatment of these women in the department.  Several of these female colleagues complained directly to Dr. Soto as well.  Dr. Soto's refusal to listen to concerns about safety and discriminatory conduct raised by female staff members would turn out to be a pervasive issue

---

[2] Morbidity and Mortality Conferences are regularly occurring conferences held at the hospital to discuss specific cases where patients experienced complications and/or adverse outcomes in an effort to learn from the behavior that led to the complication and/or adverse outcome and to mitigate future medical errors.

that haunted Dr. O'Horo throughout her employment. In August 2018 a group of nurses met with Dr. Soto to discuss their safety concerns about Dr. Higgins. Nothing was done and ultimately the nurse who initiated this meeting left BMC.

36.     Over the course of the spring and summer 2018, multiple people reported similar quality and safety concerns about Dr. Higgins directly to Dr. Soto as well.

37.     Around this time, while speaking to Dr. Vilvendhan about the number of safety related issues surrounding Dr. Higgins, he dismissively told her that perhaps Dr. Soto would listen to her complaints "because she was a woman", i.e. that she was a member of a protected class and therefore had standing to complain about Dr. Higgins. Dr. O'Horo rightfully found the comment upsetting because she believed it was dismissive of the genuine patient safety concerns she was raising, her extensive experience in patient safety and interventional radiology (more than all of the other members of the entire Interventional Radiology group combined), and suggested that her complaints were valued differently in the department because of her gender. She complained about this comment to Dr. Soto, who did nothing.

38.     In fact, Dr. O'Horo began to believe precisely the opposite was true: that her complaints were being ignored "because she was a woman."  Indeed, her male colleagues were routinely given preferential treatment and offered opportunities that were not offered to her— plainly demonstrating that her presence in the division was not valued.

39.     For example, Dr. Higgins, who was substantially junior to Dr. O'Horo and not a Board certified Interventional Radiologist, was offered and accepted the opportunity to act as a visiting professor in China in the summer of 2018.  Dr. Soto gave Dr. Higgins this opportunity even though he had already received multiple complaints about Dr. Higgins' practice. The following year, another junior male attending was offered a similar position in South America.

Neither opportunity was ever extended to Dr. O'Horo.  These opportunities afforded those male physicians with the ability to claim international academic work on their curriculum vitae and to further their international reputation, an important factor for consideration to promotion to Associate or Full Professor.  Dr. Soto continued to disregard Dr. O'Horo's expertise and overlooked her for key positions in the department. In late 2018, BMC posted the position of Division Chair of Interventional Radiology on the website for the American College of Radiology—a position Dr. Soto had suggested just months prior would be Dr. O'Horo's once Dr. Vilvendhan was no longer able to fulfill its obligations.

40.     Even though she had repeatedly expressed interest in the position, had better qualifications for the position than Dr. Vilvendhan, who was apparently performing the position so poorly that BMC posted a notice of the position as if it were an open position, and was performing her job as the Director of Quality and Safety of Interventional Radiology at an exemplary level, Dr. Soto never discussed the open position with Dr. O'Horo.

41.      The posting for the position of Division Chief of Interventional Radiology was removed before Dr. O'Horo had an opportunity to formally apply.

42.     Dr. Vilvendhan did ultimately leave BMC in June 2020.  Upon information and belief, only one woman was interviewed for the position. The male candidate hired to replace Dr. Vilvendhan was from the same hospital as the female candidate, but was junior to her at that hospital.

43.     In addition to the derisive comment about her gender and the plainly preferential treatment afforded to her male colleagues, Dr. O'Horo was routinely talked down to, her technical skill was often questioned and her professional judgement dismissed, even though she had been practicing the longer than all of the other physicians in the division combined and

12

despite the fact that she was hired to improve quality and safety in the Interventional Radiology Division based on her extensive prior experience.  This occurred throughout the duration of her employment, and male physicians within the department were not treated this way.

44.    Other women in the department faced similar mistreatment. When a female resident had the audacity to report Dr. Higgins for failing to return a page (which was documented to have happened on several occasions, and posed a patient safety risk) , she was rewarded with a negative review from Dr. Higgins.  Dr. O'Horo complained to Dr. Soto about how such retaliatory behavior contributed to a culture of silence and prevented people from stepping forward with concerns.  He did nothing.

45.    In any event, Dr. Higgins' tactics worked, and the resident elected not to pursue a career in interventional radiology.  Because Dr. Soto failed to address many residents' safety concerns about Dr. Higgins and because residents feared retaliation from Dr. Higgins when they raised safety concerns, the Chief Residents eventually established an anonymous reporting structure to address Radiology resident concerns.

46.    Another way in which this discriminatory atmosphere manifested was the way in which vacation time and call was assigned.  Dr. O'Horo routinely submitted requests for vacation time six months in advance, and was vocal about how certain scheduling decisions and last minute scheduling changes impacted her ability to attend to her childcare and family needs.

47.    Although administrative staff for the division entered in scheduling requests, the Division Chief, Dr. Vilvendhan and the Department Chair, Dr. Soto, had ultimate authority to determine what would and would not be approved.  The schedule was frequently altered at the last minute to favor the schedules of male physicians, even though Dr. O'Horo made it clear that she relied on the published schedule to manage family obligations and childcare needs.  For

example, in the published schedule, Dr. O'Horo was not on call during the three-day weekend

for Columbus Day weekend in 2018, and planned childcare commitments around that time, when

her children were off from school.  Less than two weeks before the Columbus Day weekend, Dr.

Vilvendhan attempted to abruptly change the schedule to require Dr. O'Horo to take call, rather

than any of the male attendings.  Male physicians in the division were not treated this way.

48.     Even worse, Dr. O'Horo's vacation requests were often ignored, or the requests

were altered at the last minute so that male physicians could receive their requested time off

instead—despite a policy that such requests were honored on a "first come, first served" basis.

49.     For example, Dr. O'Horo submitted requests in February 2018 for vacation time

around December 2018.  Nevertheless, preference was given to two male physicians for that

vacation week, even though there was no evidence that either had submitted their requests as

early as Dr. O'Horo had.

50.     Throughout the entirety of her employment (and up to her ultimate separation),

the schedule was routinely manipulated to benefit her male colleagues, in particular Dr. Higgins.

**IV.     DESPITE SERIOUS CONCERNS, BMC TURNED A BLIND EYE TO DR. HIGGINS, WHO INSTEAD BELITTLED DR. O'HORO'S TECHNICAL ABILITY.**

51.     As part of the quality and safety program that Dr. O'Horo developed, in July

2018, all junior attending physicians in the division were placed on a focused professional

practice evaluation ("FPPE").  The FPPE tracked the performance of each junior physician in the

department for a specified number of procedures in core competencies, as well as pre-procedure

and post-procedure conduct—consistent with the requirements set forth by the Joint Commission

on Accreditation of Healthcare Organizations, the non-profit entity responsible for accrediting

healthcare facilities throughout the country, and consistent with the Interventional Radiology Guidelines published by CRICO's Academic Medical Center Patient Safety Organization.

52.     While Dr. O'Horo was monitoring Dr. Higgins as part of the FPPE process, Dr. O'Horo noticed that Dr. Higgins was mishandling a catheter in the patient's artery, and provided some feedback in an attempt to explain how to improve his technique.  He condescendingly dismissed her concerns, and told her she was wrong about the technique, in front of nurses, staff and an anesthesiologist who was present during the procedure.  Dr. Higgins did not speak to the male physicians in the department this way.

53.     Following this incident, Dr. O'Horo met with Dr. Soto to discuss Dr. Higgins' condescending behavior toward her and her continued concerns about Dr. Higgins' technical ability in August 2018.  Rather than take any action to prevent future harm to patients or to remedy his demeaning and discriminatory behavior, Dr. Soto adopted a "wait and see" approach, telling Dr. O'Horo, "let's see what happens and how it goes," ignoring the ongoing patient harm Dr. Higgins was causing.

54.     With respect to Dr. Higgins' inappropriate behavior toward her, Dr. Soto suggested it was merely a "communication issue".

55.     The incident was so obviously discriminatory that Dr. Rafael Gonzalez, Director of Quality and Safety for the Department of Anesthesia also complained about the way in which Dr. O'Horo was treated by Dr. Higgins and about his concerns with Dr. Higgins' abilities. Once again, Dr. Soto ignored the complaint.

56.     Thereafter, she sent an email to Dr. Soto documenting her concerns, which included Dr. Higgins' administration of tissue plasminogen activator to the incorrect collateral vein, which he mistook for the subclavian vein and subjected the patient to a 24-hour Intensive

Care Unit stay with blood thinning medicine being incorrectly delivered to the wrong site—the type of mistake no practicing interventional radiologist should have made.  Dr. O'Horo explained to Dr. Soto that the incident may have constituted another SRE.  After this email, Dr. Soto urgently paged Dr. O'Horo to his office and reprimanded her for putting this incident in writing and failed to address her concerns that the issue was potentially a SRE.

57.     Dr. Higgins subsequently admitted that he had administered tissue plasminogen activator to the wrong vein, but no investigation was conducted.  Around this time, Dr. Higgins' FPPE was placed on hold.

58.     At least as of Dr. O'Horo's separation from employment in January 2020, Dr. Higgins' FPPE had not been completed, although it had been completed for two-thirds of the other male staff members hired after its implementation without concern.

59.     In November 2018, one of the Interventional Radiology staff members reported to Dr. O'Horo that Dr. Vilvendhan told her "[w]e have to protect [Dr. Higgins]."

60.     In December 2018, Dr. O'Horo met with Dr. Soto to review the increasingly significant number of reportable events caused by Dr. Higgins, described variously above, but which she was concerned had not been appropriately reported.  Dr. Soto was largely dismissive of Dr. O'Horo's concerns, and instead accused Dr. O'Horo of being biased against Dr. Higgins because he is a person of color. Dr. Soto told Dr. O'Horo that if she had ongoing concerns she should discuss them with Dr. Moses. As would later become clear, this was not a suggestion but a threat.

61.     Around this time, in order to track outcomes to measure quality and safety events with the goal of developing division-wide safety improvements, Dr. O'Horo created a database using Microsoft Excel to objectively monitor quality and safety for the entire interventional

radiology group, and began more closely tracking complications caused by all physicians in the division, including herself.  She worked with the entire division to ensure that the measures being tracked were transparent and well-understood.  Dr. O'Horo was forced to create this database because the hospital refused to purchase the HIIQ software.

62.     In late December 2018, while attempting to facilitate the treatment of a developmentally delayed teenaged patient who required an exchange blood transfusion, Dr. Higgins placed a single lumen power port in the patient's internal jugular vein, when he was supposed to place a double lumen vortex port in the patient.  Dr. Higgins' use of the incorrect device was especially egregious under the circumstances—single lumen power ports are unsuitable for the high flow exchange transfusions for which the vortex port was being used to treat the patient's disease and the procedure and requested device was discussed at their morning rounds.  Because of the patient's underlying condition, he had to have both the initial and repeat procedures under general anesthetic.

63.     After Dr. Higgins replaced the incorrect device with the correct one, the replaced port subsequently clotted—an infrequent event, and which again raised serious questions again about Dr. Higgins' basic technical skills.

64.     Dr. Higgins subsequently claimed that he had mixed up this patient with another port insertion scheduled for that day; however, the referring pediatric team had specifically walked down to discuss the procedure to ensure that the correct port was available prior to the procedure. The safety pause conducted before the procedure begins is established to prevent this "never event."

65.     Dr. O'Horo considered this to be an extremely rare complication and was rightfully alarmed by it.  She was not the only one: Dr. Sharon O'Brien, Chief of Pediatric

17

Cardiology, was so concerned by this incident that she brought it to the attention of Dr. James

Moses, BMC's Chief Quality Officer and Vice President of Quality and Safety at BMC.  Dr.

O'Brien's complaints also appeared to have been ignored.

### V.   BECAUSE OF DR. SOTO'S INACTION, DR. O'HORO ESCALATES HER SAFETY CONCERNS WITHIN THE HOSPITAL.

66.   In January 2019, Dr. O'Horo met with Dr. Moses.  During that meeting, Dr.

O'Horo detailed for him Dr. Higgins' cases she found most disturbing.  Following that meeting,

on January 18, 2019, Dr. O'Horo sent Dr. Moses a non-exhaustive list of additional

complications caused by Dr. Higgins, which identified therein the complications which

constituted Serious Reportable Events under state and federal regulations, including some events

which should have been reported to the DPH.  Dr. Moses suggested that a meeting should occur

with Dr. Davidoff, Dr. Soto, himself and her. That meeting never happened.

67.   Shortly after Dr. O'Horo's meeting with Dr. Moses, Dr. Soto actually canceled a

meeting with Dr. O'Horo that had been scheduled to discuss Dr. Higgins' progress on the FPPE.

68.   Dr. O'Horo later found out that Dr. Moses had escalated the conversation to Dr.

Ravin Davidoff, BMC's Chief Medical Officer, in her absence.  In explaining the situation to Dr.

Davidoff, Dr. Soto apparently presented Dr. O'Horo as the problem, suggesting she lacked

"emotional intelligence" and that her concerns were simply the result of a communication

problem she was having.  By asserting that Dr. O'Horo's complaints all stemmed from a lack of

"emotional intelligence", Dr. Soto seemed to suggest that she was not operating rationally based

on the data she had collected over months, and was instead exaggerating the issues because she

was an overly "emotional" woman—an invidious stereotype that women are more emotional and

less analytical than men despite her 16 years of experience in IR safety.

69.     Around this time, Dr. Soto's attitude toward Dr. O'Horo changed, and he became noticeably colder.  Though Dr. Soto and Dr. O'Horo had previously met at least monthly to discuss quality and safety issues within the division, he stopped meeting with her to discuss these issues because he did not like what she had to report.

70.     While the hospital failed to act, Dr. Higgins continued to cause serious safety and quality issues.  In January 2019, Dr. Higgins placed a multi-sidehole biliary catheter in a patient, instead of a multipurpose drain.  The patient leaked caustic bile for several days causing skin erosion and pain until Dr. Higgins' error was detected and the correct tube was replaced.  As Dr. O'Horo was preparing to submit a report about this incident through STARS (BMC's internal risk management reporting system), Dr. Soto came running into the room and prevented her from submitting it.  Dr. Soto later undermined Dr. O'Horo's role as Director of Quality and Safety for Interventional Radiology by asking Dr. Vilvendhan to review the case independently.  Dr. Vilvendhan confirmed Dr. O'Horo's report. This happened on multiple occasions: every time a complication occurred, Dr. Soto would ask Dr. Vilvendhan, who had less experience and was in an inferior position, to check Dr. O'Horo's review and determine if he agreed or disagreed.

71.     Dr. O'Horo was so distressed by Dr. Soto and the hospital's active coverup of Dr. Higgins' misconduct that she became physically ill.

## VI.     RATHER THAN ADDRESS HER CONCERNS, BMC BEGAN A RETALIATORY CAMPAIGN AGAINST DR. O'HORO.

72.     After she met with Dr. Moses, Dr. Soto began to retaliate against Dr. O'Horo. BMC diminished Dr. O'Horo's role within the department: it stripped her of her responsibility for reviewing the Division's policy of pre-procedure lab requirements, and reassigned the work to Dr. Vilvendhan, who later passed it on to one of the less experienced physician assistants in the division.

73.     All the while, Dr. O'Horo continued to be subjected to disparate treatment on the basis of her gender: her regular academic day (non-clinical time which she could use to focus on academic work) was reassigned so that she no longer had a fixed academic day. This lack of consistency created significant difficulty for Dr. O'Horo, especially as it related to childcare—Dr. Soto and Dr. Vilvendhan were well aware of the problems this imposed, as Dr. O'Horo had repeatedly explained (and been granted) the need for a fixed academic day the prior year.  Her male colleagues were not similarly treated.

74.     In February 2019, Dr. Higgins broke off a lidocaine needle in a patient's kidney during a renal biopsy.  The patient required a second procedure to retrieve the needle.  This type of complication was so uncommon that Dr. O'Horo had never previously seen it occur (nor had any other physicians she spoke with in the Interventional Radiology Department, for that matter), even though she had spent a substantial portion of her career reviewing every complication which occurred in interventional radiology while at Brigham and Women's Hospital.

75.     This complication was particularly egregious because under the FPPE process Dr. O'Horo had devised, Dr. Higgins should not have been permitted to perform the renal biopsy unsupervised until he had completed three others satisfactorily.  This portion of the FPPE process was established after the Pathology department early on had raised concerns about Dr. Higgins' technical abilities. Nevertheless, Dr. Soto expressly allowed Dr. Higgins to override the FPPE process in order to perform the procedure and again, harm came to a patient.

76.     Although the unintended retention of a foreign object, such as a lidocaine needle, constitutes a SRE, upon information and belief, no report was made to the DPH documenting this incident.

20

77.     Shortly thereafter, Dr. O'Horo heard from another female physician that Dr. Soto's "cardinal rule" was to "never go around him"—that is, never to report concerns within his department to those above him in the hospital's hierarchy, even if the hospital's own procedures or governmental regulation required it.

78.     Soon enough, Dr. O'Horo experienced the consequences of violating Dr. Soto's "cardinal rule": Dr. Soto offered opportunities to several of the male physicians that were never offered to Dr. O'Horo, and repeatedly passed her over for leadership roles within the department.

79.     This conduct was not only retaliatory, but further fueled Dr. O'Horo's belief that her safety concerns were being disregarded because she was a woman because it was clear that even her substantially less qualified male colleagues were being treated better than she was by Dr. Soto.

80.     Dr. Vilvendhan too was beginning to retaliate against Dr. O'Horo.  He engaged all of the physicians in the division (all men) except for Dr. O'Horo in a trial of intravascular ultrasounds in fistulagrams..  Much like visiting professorships, participation in medical studies can be included on an individual's curriculum vitae and are necessary to secure academic promotion. This study was ongoing through the Winter of 2020 and Dr. O'Horo was excluded from participation until the time of her discharge.

81.     Dr. Vilvendhan also facilitated paid training and travel and conference attendance for several of the more junior, male physicians, including Dr. Higgins, in the use of a medical device.  Dr. O'Horo was never offered any training but was still expected to safely perform the procedure using the device.

82.     While Dr. O'Horo was being subjected to discrimination and retaliation, Dr. Higgins continued to cause harm to patients.

83.     In March 2019, Dr. Higgins missed an active extravasation from a pelvic angiogram on a trauma patient that had a retroperitoneal bleed and a pelvic bleed.  The patient died the next morning, likely at least in part as a result of the missed angiogram finding. Although Dr. O'Horo was asked to review the case for BMC's trauma conference, the case subsequently disappeared from the agenda.  This was highly unusual given that trauma deaths are routinely reviewed by BMC and are a requirement of Level 1 trauma certification. Dr. Higgins missed findings on other angiograms where patients continued to bleed until the missed finding was detected by and acted upon by another physician.

84.     In early April 2019, Dr. Soto held a meeting with Drs. O'Horo, Higgins, and Vilvendhan and brushed off the issues in the division as a "professionalism" problem among these physicians—including Dr. O'Horo as part of the problem.  He did not address the patient safety concerns that Dr. O'Horo had repeatedly raised about Dr. Higgins or Dr. Higgins' rude and condescending behavior toward female staff (including Dr. O'Horo).

85.     Two weeks after Dr. O'Horo presented data at the Radiology Morbidity and Mortality Conference regarding complications within the Interventional Radiology Division, over the course of a weekend when Dr. Vilvendhan had been called in to assist Dr. Higgins on two routine arterial cases (and were the only two interventional radiologists at the hospital that weekend), the database Dr. O'Horo had created to monitor all complications by the division was deleted from a computer in the division's shared work room.  The database demonstrated that Dr. Higgins had a greater number of complications than any other physician in the division for those complications measured.  Of the measured complications, Dr. Higgins had 56%, 4 times higher than the next physician. Again, no investigation was performed.

86.     Strikingly, Dr. Higgins was the only junior attending who routinely required Dr. Vilvendhan's assistance on cases—either in person or by phone.

87.     Despite his own technical deficiencies, Dr. Higgins continued to question Dr. O'Horo's knowledge of anatomy in a condescending manner in front of residents—a problem which continued throughout the entirety of her employment.  On one occasion in particular, Dr. O'Horo told him that his questions and tone were unprofessional and she removed herself from the conversation.  Dr. O'Horo felt embarrassed by Dr. Higgins' treatment.  This was all the more egregious because Dr Higgins was actually incorrectly identifying basic anatomy to the trainees.

88.     By mid-2019, Dr. O'Horo was excluded from discussions concerning the revision of interventional radiology case requests—even though she had initiated the project and it fell within her role as Director of Quality and Safety in Interventional Radiology.

89.     Other projects were also siphoned off: in May 2019 the Department of Radiology at Dr. Soto's direction engaged a male Northeastern Undergraduate Co-Op Student to improve the teams' first case on time starts ("FCOT").  Dr. O'Horo had extensive experience working with and improving FCOT's and was the only Interventional Radiologist in the Boston area with this specific experience.  She had expressed an interest multiple times in working on this project—something she considered integral to quality and safety and which would have fallen naturally within her role as Director of Quality and Safety.  Nevertheless, her offers of help with this important initiative were rebuffed and the entirety of the project was given to an inexperienced male undergraduate.

90.     Over the course of the summer of 2019, Dr. O'Horo became aware that other women in the radiology department had complained about Dr. Soto's treatment of them—she later came to understand that Dr. Soto likely viewed her as a "hysterical woman."

91.     In July 2019, Dr. O'Horo met with Dr. Moses again—this time she not only raised concerns about the ongoing patient safety issues surrounding Dr. Higgins, but she complained about the "culture of silence" that Dr. Soto had created by disregarding her concerns, or belittling individuals who dared to come forward.

92.     In August 2019, Dr. Higgins caused a patient's inferior vena cava to rupture while attempting to retrieve an inferior vena cava filter in a manner that Dr. O'Horo considered to be well outside the standard of care.  Despite the severity and rarity of this complication, upon information and belief, the incident was never referred to a committee for review.

93.     As soon as Dr. O'Horo became aware of the issue, she notified both Dr. Soto and Dr. Vilvendhan.  Although Dr. O'Horo had already reviewed the case, Dr. Soto instructed Dr. Vilvendhan to review the case— further undermining Dr. O'Horo's role as Director of Quality and Safety within the division.   Dr. Soto ultimately asked Dr. O'Horo to speak to Dr. Higgins about the incident but told her to do so "in a place where there is nobody else around."

### VII.     HORRIFIED BY THE CONTINUED INACTION, DR. O'HORO ONCE AGAIN ESCALATES HER CONCERNS BY SENDING A WHISTLEBLOWER LETTER TO BMC'S CHIEF MEDICAL OFFICER.

94.     Still frustrated by the hospital's inaction in the face of ongoing harm to patients, on September 13, 2019, Dr. O'Horo sent a letter ("the Whistleblower Letter") to Dr. Ravin Davidoff, BMC's Chief Medical Officer, further documenting her concerns about Dr. Higgins. In the Whistleblower Letter, Dr. O'Horo cited G. L. c. 149, §187, the statute which protects medical providers who blow the whistle from retaliation.  Dr. O'Horo attached to the letter a list of troubling complications by Dr. Higgins, as well as a detailed review of the recent filter retrieval incident, and a presentation she had prepared for her department's Morbidity and

Mortality Conference which demonstrated that Dr. Higgins had far greater complications than any other physician in the division.

95.     Around the same time, in the fall of 2019. a group of radiologists, including another female Radiologist, went to Dr. Davidoff to complain about Dr. Soto's misogynistic, discriminatory behavior.  Ultimately, Dr. Davidoff did nothing to address their concerns.

96.     Dr. O'Horo later became aware that at least one other female attending physician in the Radiology Department had complained to Dr. Davidoff about Dr. Soto's mistreatment and favoritism of male physicians.

97.     Dr. O'Horo subsequently met with Dr. Davidoff to discuss her concerns about Dr. Higgins and Dr. Soto  She expressed that Drs. Soto and Vilvendhan were allowing this unsafe practitioner to continue to perform procedures despite his egregiously poor technical skills and clinical judgement as well as her concerns about Dr. Soto's discriminatory and retaliatory behavior.

98.     The same week that Dr. O'Horo sent her letter to Dr. Davidoff, Dr. Higgins was involved in yet another incident which resulted in the placement of a port (intended for administering chemotherapy) in the wrong site.  When Dr. O'Horo emailed Dr. Soto to notify him that the incident was potentially reportable to the DPH, he told her that he disagreed and wanted to confer with Dr. Moses.  Dr. Soto later added that "avoiding emails is the way to go."

99.     Shortly after Dr. O'Horo sent her letter to BMC leadership, Dr. Soto announced that Dr. Higgins had been selected for the position of Medical Student Clerkship Director—a role that had never even been offered to Dr. O'Horo, despite her seniority and her close mentorship of many of the residents and medical students within the program.  Dr. Soto's decision to give the job of teaching and mentoring medical students to Dr. Higgins was

particularly outrageous given that he had to be removed from a similar position with residents, that he was not Board Certified in Interventional Radiology, and that he himself required frequent consultations with Dr. Vilvendhan while performing procedures because of his poor skills.

100.    It is especially striking that Dr. Higgins was given that position because he was simultaneously being removed as the Director for the Early Specialization in Interventional Radiology program because the radiology residents had complained so vehemently about his abilities and demeaning treatment by Dr. Higgins.  He was also not board certified as an Interventional Radiologist.  That role was later awarded to Dr. Ezra Burch, the newest and most junior of all the interventional radiology attendings.  As with the Medical Student Clerkship Director, the position was never offered to Dr. O'Horo.

101.    Throughout this period, Dr. O'Horo continued to be subjected to differential treatment on the basis of her gender.  For example, on one occasion, Dr. O'Horo was penalized when a family emergency arose which required her to miss several days of work, one of which was an "academic day".  An "academic day" was the day each week reserved for each Interventional Radiology to devote to academic endeavors, including meetings and other appointments.  If the division was short staffed (i.e., if there was only one physician on staff for the day, rather than two) another attending would necessarily be required come in on their academic day to help. This was not the case that day.

102.    However, when Dr. O'Horo had a family emergency and had to leave unexpectedly, Dr. Vilvendhan instructed division administrative staff to remove one of Dr. O'Horo's academic days, giving himself the extra academic time–even though two other physicians were on staff that day and there was no need to otherwise alter the schedule.

26

103.    Male physicians in the division were not similarly penalized.  Indeed, on at least

one occasion, Dr. Higgins simply left early on a regular workday in order to teach a yoga class,

leaving patients in need of treatment to be attended to by the only other physician on staff that

day.  In fact, Dr. Soto reprimanded the physician who stayed late to care for patients in Dr.

Higgins' absence. Dr. Higgins was not in any way penalized or required to pay back any time.

104.    Throughout the course of her employment, Dr. Higgins also continued to make

discriminatory comments to Dr. O'Horo, seeming to suggest that she was less qualified than her

male colleagues. He regularly told her that he had reserved more complex cases for himself or

for Dr. Vilvendhan, even though Dr. O'Horo was more experienced than either of them.  Dr.

O'Horo understandably found these types of comments to be incredibly insulting, disrespectful

and unfounded.  Whenever these comments were made, Dr. O'Horo routinely complained to Dr.

Vilvendhan.  When he ignored her, she later complained directly to Dr. Soto, who never did

anything to intervene on her behalf.  Instead, Dr. Soto continued to accuse Dr. O'Horo of having

a professionalism problem.

105.    In October 2019, Dr. Higgins broke off a needle in a patient's liver while

performing a procedure for the second time in less than a year. This time, instead of a lidocaine

needle, Dr. Higgins fractured a biopsy needle in a patient.  The patient required a subsequent

surgery to retrieve the needle from his liver.  As with the February incident, the unintended

retention of a portion of the needle likely constituted a SRE and should have been reported to the

DPH.  Upon information and belief, no such report was made by the hospital.

106.    Not only did the hospital fail to report this serious complication, but the day that

Dr. Higgins was supposed to present his cases—including this incident—at the Morbidity and

Mortality conference, Dr. Higgins emailed Dr. O'Horo to say that he was not able to present his

cases.  Curiously, this email came shortly after a private meeting between Dr. Soto, Dr. Higgins,

and Dr. Vilvendhan.  The multiple "never events" which occurred in the division with basic

procedures and major procedures were solely attributable to Dr. Higgins. None of the other

providers in this time period had "never events" as one would expect.

107.    Upon information and belief, in late-October 2019, Dr. Soto instructed Dr.

Vilvendhan to retrospectively review a selection of Dr. Higgins' cases for quality and safety

concerns—even though such a review would have fallen squarely within the purview of Dr.

O'Horo's position as Director of Quality and Safety for Interventional Radiology.

108.    The following month (November 2019), Dr. O'Horo met with Dr. David

McAneny, the Vice Chair of the Department of Surgery, to discuss safety concerns arising out of

with Dr. Higgins.  At Dr. Soto's urging, Dr. Vilvendhan also attended the meeting, even though

the discussion concerned quality and safety issues that fell within Dr. O'Horo's responsibilities.

Dr. Vilvendhan's presence in the meeting was so notable that Dr. McAneny commented about it.

In any event, it was apparent that Dr. McAneny did not take Dr. O'Horo's concerns very

seriously, as he concluded the meeting by asking if Dr. O'Horo would "buy [him] a six pack" if

he "fix[ed] this" for her.  Dr. O'Horo found this comment incredibly sexist and patronizing.

## VIII.  AFTER LONG DELAYS, THE HOSPITAL IMPLEMENTS A SUPERFICIAL PLAN DESIGNED TO COVERUP DR. O'HORO'S SAFETY CONCERNS.

109.    More than two months after Dr. O'Horo's Whistleblower Letter and nearly eleven

months after her first complaint to Dr. Moses, on November 26, 2019, Dr. Moses (BMC's Vice

President of Quality and Safety) relayed that the hospital planned to have Dr. Vilvendhan—an

individual who had reportedly confessed a need to "protect" Dr. Higgins—observe all of the

interventional radiologists in the division during "major" procedures (which was undefined)

performed during normal working hours (that is, no observation would be done when a physician

was "on call" and called in outside of normal working hours).  The hospital gave such little

thought to this review that Dr. Vilvendhan's only parameters were to determine whether the

procedure was "safe" or "not safe."  Their plan was not communicated in writing and all efforts

to obtain their plan in writing were rebuked.  Strikingly, such a review would have been one of

Dr. O'Horo's core responsibilities as the Quality and Safety Director for Interventional

Radiology, much like the FPPE she had devised, but deliberately far less transparent.

110.    During that same meeting, Dr. Moses also relayed that although the hospital

eventually intended to hire an external investigator, none had yet been engaged and no set

timeline for hiring an external investigator has been established.  Perhaps unsurprisingly, no

women were considered for the external investigator role.

111.    Shortly after, Dr. O'Horo complained to Dr. Davidoff and Dr. Moses about the

deficiencies with the hospital's proposed plan—namely that, unlike the FPPE process, the

criteria for the observation were ill-defined, not in writing, and that the observation would not

catch all significant complications.  She also voiced concerns that Dr. Vilvendhan was biased

toward Dr. Higgins.

112.    By this point, much of Dr. O'Horo's duties had been stripped from her and she

remained Director of Quality and Safety in Interventional Radiology in title only—she had little

actual authority to monitor safety issues and implemental quality improvements.

113.    The retaliation continued.  After her report to the DPH, Dr. Soto failed to provide

Dr. O'Horo funding she had been awarded together with the Director of Quality and Safety of

Anesthesiology, Dr. Wendy Gross, as part of a patient safety grant that she had been given in the

fall of 2019.  Dr. Gross has already received her funding and an increase in academic time, and

indicated that she was led to believe that Dr. O'Horo was due the same amount of funding and associated academic time that she had received.  Dr. Soto never granted Dr. O'Horo any funding, or even any additional academic time, despite prodding from Dr. Rafael Ortega, the Chair of Anesthesiology (the Chair of Dr. Gross' department).

IX.   **WITH NO OTHER RECOURSE AVAILABLE, DR. O'HORO REPORTS HER CONCERNS TO THE DEPARTMENT OF PUBLIC HEALTH AND BOARD OF REGISTRATION IN MEDICINE.**

114.   Alarmed that the hospital's plan would do little, if anything, to prevent harm to patients, Dr. O'Horo felt compelled to report her concerns about Dr. Higgins and BMC's active coverup of her complaints to the DPH and Board of Registration in Medicine (the body responsible for physician licensure in Massachusetts) (the "Board") by way of letter on December 7, 2019.

115.   Ostensibly in recognition of the severity of the patient safety issues that BMC was creating by letting Dr. Higgins work unmonitored, less than a week after Dr. O'Horo sent her letter, DPH began an investigation of BMC's Interventional Radiology Division, and spent several days interviewing and observing physicians within the division, as well as other physicians and staff members who regularly interact with the interventional radiologists.

116.   Dr. Vilvendhan's "review" of major procedures performed by each physician in the Interventional Radiology Division began around the time that DPH began its investigation. Even though Dr. Vilvendhan is a less experienced practitioner than Dr. O'Horo, he was expected to scrutinize her procedures and report back to BMC leadership.  In fact, Dr. O'Horo was scheduled to be observed seven more times than any of the male physicians in the department (including Dr. Higgins).

117.     A week after DPH came to the hospital, Dr. Soto conducted a meeting with all of the physicians in the Interventional Radiology Division—except for Dr. O'Horo.  Dr. O'Horo was never invited and no attempt was made to include her in the meeting.  Not only did Dr. Soto exclude Dr. O'Horo from this meeting, but he also stopped responding to Dr. O'Horo's emails— even those that concerned routine issues like scheduling.

118.     Dr. Vilvendhan stopped speaking to Dr. O'Horo when the DPH investigation began.  Dr. O'Horo was frozen out, and constructively discharged.

119.     During the course of the investigation, BMC asserted to DPH that it had placed Dr. Higgins on probation.

120.     However, no report of Dr. Higgins' probation appears on his Board profile.  This is striking because if BMC had placed Dr. Higgins on probation such that he was prevented from performing procedures unsupervised, it was required to report such probation to the Board.

121.     Dr. Soto continued to assert that the problem was Dr. O'Horo. He had engaged a social worker to work on "group dynamics" yet the social worker only reached out to Dr. O'Horo to schedule a one-on-one meeting.

122.     Dr. Higgins continues to be employed at BMC despite recently punching a wall and breaking his hand while at work and being placed on leave. For her part, Dr. O'Horo, after having been effectively stripped of her primary job duties and after suffering years of retaliatory and discriminatory treatment, acknowledged that she had been constructively terminated by BMC and left the hospital's employ on January 20, 2020.

**COUNT I**
**Title VII, 42 U.S.C. §2000e-2(a)**
**(All Defendants)**

123.    Dr. O'Horo incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

124.    Dr. O'Horo was discriminated against and harassed based on her gender by her supervisors and coworkers in violation of Title VII, 42 U.S.C. §2000(e).

125.    She was subjected to both disparate treatment, and unwelcome, discriminatory, gender-based comments, which were severe and pervasive, and which detrimentally affected Dr. O'Horo.

126.    As a result of Defendants' discriminatory and retaliatory conduct, Dr. O'Horo has suffered and continues to suffer damages, including economic damages and emotional distress.

## COUNT II
## M.G.L. c. 151B, §4
**(All Defendants)**

127.    Dr. O'Horo incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

128.    Dr. O'Horo was discriminated against and harassed based on her gender by her supervisors and coworkers in violation of M. G. L. c. 151B, §4.

129.    She was subjected to both disparate treatment, and unwelcome, discriminatory, gender-based comments, which were severe and pervasive, and which detrimentally affected Dr. O'Horo.

130.    As a result of Defendants' discriminatory and retaliatory conduct, Dr. O'Horo has suffered and continues to suffer damages, including economic damages and emotional distress.

**COUNT III**
**M.G.L. c. 151B, §4(5)**
**(Dr. Soto)**

131.    Dr. O'Horo incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

132.    Through the acts and omissions described above, Dr. Soto aided, abetted, incited, compelled and coerced the doing of acts forbidden by G. L. c. 151B, § 4(5).

133.    As a result of Dr. Soto's illegal conduct, Dr. O'Horo has suffered and continues to suffer damages, including economic damages and emotional distress.

**COUNT IV**
**VIOLATION OF G.L. c. 149, § 187**
**(Against BMC)**

134.    Dr. O'Horo incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

135.    At all relevant times, Dr. O'Horo was a health care provider as defined in Mass. General Laws c. 149, §187.

136.    At all relevant times, BMC was a health care facility as defined in Mass. General Laws c. 149, §187.

137.    Dr. O'Horo had a reasonable belief that the conduct of BMC  as it related to Dr. Higgins—including allowing Dr. Higgins to continue to practice unmonitored and failing to report his complications both internally and to regulatory bodies (including the DPH)—constituted a "violation of a law or rule or regulation promulgated pursuant to law or violation of professional standards of practice" pursuant to Mass. General Laws c. 149, §187.

138.    Dr. O'Horo regularly raised concern over failures in the quality of patient care within the Interventional Radiology division.  When that failed, she brought her concerns to the

Vice President of Quality and Safety for BMC.  When still no action was taken, she wrote a

Whistleblower Letter and sent it to the hospital's Chief Medical Officer.  Finally, when all her

internal options had been exhausted and when it became apparent that defendants had no

intention of taking any corrective action with respect to Dr. Higgins, Dr. O'Horo brought her

concerns to the Department of Public Health and the Board of Registration in Medicine, both

public bodies, and thereafter participated in their investigations.

139.    Through its agents, BMC (which was aware of Dr. O'Horo's protected conduct)

repeatedly dismissed and ignored her concerns and complaints about serious quality and safety

issues occurring at the hospital.  Instead, BMC retaliated against Dr. O'Horo by diminishing her

role and giving her responsibilities to others in the division, passing her over for visiting

professorships and program director roles, excluding her from clinical trials, marginalizing her,

not awarding her the funding and academic time provided by her Safety grant, falsely asserting

that she was biased against Dr. Higgins, and subjecting her to a retaliatory, unnecessary and

humiliating review of her clinical practice, among other things—and the entirety of this

campaign of retaliation resulted in her constructive discharge.

140.    The actions of defendants were unlawful and in violation of G.L. c. 149, §187.

BMC is responsible for the actions of its administrators and officers and those acting on its

behalf, including Dr. Soto, in violation of this statute.

141.    As a direct result of the violation of G.L. c. 149 §187, Dr. O'Horo suffered

damages in an amount to be proven at trial.

142.    Defendants are liable for the damages they have caused and continue to cause.

**COUNT V**
**RESPONDEAT SUPERIOR**
**(Against BUMC-Radiologists)**

143.   Dr. O'Horo incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

144.   At all relevant times, Dr. Soto was employed by BUMC-Radiologists. The actions Dr. Soto took that discriminated against Dr. O'Horo, that aided and abetted the discrimination of others against Dr. O'Horo, and that violated relevant whistleblower statutes, were taken on behalf of and in furtherance of BUMC-Radiologists' interests and in the course of discharging his job duties at BUMC-Radiologists.  Dr. O'Horo suffered damages in an amount to be proven at trial as a result of his actions, and BUMC-Radiologists is liable for those damages jointly and severally with Dr. Soto.

WHEREFORE, Plaintiff Dr. Susan Kiernan O'Horo M.D. respectfully requests that this Court:

(1)   Enter judgement in her favor on each count of this Complaint;

(2)   Award her compensatory damages in an amount to be determined at trial with prejudgment interest awarded from the date of the wrong or, in the alternative, from the date this Complaint was filed;

(3)   Award her punitive damages in an amount to be determined at trial

(4)   Award her attorneys' fees, expert fees, and costs;

(5)   Award injunctive relief pursuant to Mass. General Laws c. 149, §187(d)(2) and (3); and

(6)   Grant her such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

SUSAN KIERNAN O'HORO

By her attorneys,


/s/ Lisa G. Arrowood
_____

Lisa G. Arrowood (BBO #022330)
larrowood@arrowoodllp.com
Sarah E. A. Sousa (BBO #691089)
ssousa@arrowoodllp.com
ARROWOOD LLP
10 Post Office Square
7th Floor South
Boston, MA  02109
Dated: December 29, 2020        Tel: 617-849-6200