UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-12290-GAO

SUSAN O'HORO, M.D.,
Plaintiff,

v.

BOSTON MEDICAL CENTER CORP., BOSTON UNIVERSITY MEDICAL CENTER
RADIOLOGISTS, INC., and JORGE SOTO, M.D.,
Defendants.

ORDER ADOPTING REPORT AND RECOMMENDATION
September 27, 2023

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has issued a Report and Recommendation ("R & R") recommending that the defendants' motion for summary judgment (dkt. no. 64) be granted. The plaintiff has filed an objection to the R & R.

I have carefully reviewed the relevant pleadings and submissions, the transcript of the parties' oral argument before the magistrate judge, the plaintiff's objection to the R & R, and the defendants' response to the plaintiff's objection. Based on that review, I am satisfied that the magistrate judge's conclusions on each of the plaintiff's legal theories were carefully made and were soundly supportive of her dispositive recommendation. Accordingly, I approve and adopt the magistrate judge's R & R (dkt. no. 84) in its entirety. Concomitantly, I conclude that the plaintiff's objections should not be sustained, substantially for the same reasons carefully explained by the magistrate judge in the R & R.

Consequently, the defendant's Motion for Summary Judgment (dkt. no. 64) is GRANTED.

Judgment shall be entered in favor of the defendants.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| SUSAN O'HORO, M.D., )| |
| ) | |
| Plaintiff, ) | **Filed under seal.** |
| ) | |
| v. ) | |
| ) | Civil Action No. 20-12290-GAO |
| BOSTON MEDICAL CENTER CORP., ) | |
| BOSTON UNIVERSITY MEDICAL ) | |
| CENTER RADIOLOGISTS, INC., and ) | |
| JORGE SOTO, M.D., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[Docket No. 64]

August 4, 2023

Boal, M.J.

Plaintiff Susan O'Horo, M.D., filed this action against defendants Boston Medical Center

Corp., Boston University Medical Center Radiologists, Inc., and Jorge Soto, M.D. (collectively

"the Defendants") alleging gender discrimination and unlawful whistleblower retaliation.

Docket No. 1.  Defendants have moved for summary judgment on all of Dr. O'Horo's claims.

Docket No. 64.  For the following reasons, I recommend that Judge O'Toole grant the

Defendants' motion in its entirety.[1]

I.      PROCEDURAL BACKGROUND

On December 29, 2020, Dr. O'Horo filed the instant suit.  Docket No. 1.  She brings

claims of gender discrimination pursuant to Title VII, 42 U.S.C. §2000e-2(a) and M.G.L. c.

_____

[1] On May 12, 2021, Judge O'Toole referred this case to the undersigned for full pretrial
management and report and recommendations on dispositive motions.  Docket No. 20.

151B, §4 against all defendants.  Id. at 31-32.  Dr. O'Horo also brings a claim of aiding and

abetting gender discrimination pursuant to M.G.L. c. 151B, §4(5) against Dr. Soto.  Id. at 33.

Finally, Dr. O'Horo brings a health care whistleblower claim pursuant to M.G.L. c. 149, § 187

against Boston Medical Center.[2]  Id.

On November 21, 2022, the Defendants filed a motion for summary judgment.  Docket

No. 64.  On January 16, 2023, Dr. O'Horo filed an opposition, and, on January 24, 2023, the

Defendants filed a reply.  Docket Nos. 71, 75.  This Court heard oral argument on May 31, 2023.

On June 2, 2023, at this Court's request, Dr. O'Horo resubmitted her opposition with additional

citations to the record.  Docket No. 80.  On June 13, 2023, the Defendants filed a supplemental

memorandum in response.  Docket No. 82.  On July 13, 2023, the parties jointly submitted a

notice of supplemental authorities.  Docket No. 83.

II.     FACTUAL BACKGROUND[3]

A.  The Parties

1.  The Plaintiff

Dr. Susan O'Horo is an interventional radiologist who worked as Director of Quality &

Safety in Interventional Radiology for Boston Medical Center Corporation ("BMC") and Boston

University Medical Center Radiologists, Inc. ("BUMCR") from February 2018 until January

---

[2] At the May 31, 2023 hearing, Dr. O'Horo confirmed that she agreed to dismiss Count I (Title VII) against Dr. Soto only and Count V (respondeat superior) against Boston University Medical Center Radiologists, Inc.  See also Docket No. 65-1 at 7.

[3] Because this case is before this Court on a motion for summary judgment, I set out any disputed facts in the light most favorable to the non-moving party, Dr. O'Horo.  See Ahern v. Shinseki, 629 F.3d 49, 53-54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)).  The undersigned relies on the Defendants' statement of undisputed material facts ("Def. SOF"), which incorporates Dr. O'Horo's responses ("Pl. Resp.") and Dr. O'Horo's additional statements of material fact ("Pl. SOF"), which incorporates the Defendants' responses ("Def. Resp.").  All of the "Def. SOF" and "Pl. SOF" references are in the parties' combined statement of material facts at Docket No. 76-1.

2020.[4]

### 2. The Defendants

BMC is an academic medical center and Level 1 trauma provider in Boston.[5]  BUMCR is a professional corporation that employs radiologists to practice medicine at BMC.[6]  Dr. Jorge Soto is BMC's Chief of Radiology at BMC and President of BUMCR.[7]  He was also Dr. O'Horo's direct supervisor at all times during her employment.[8]

### B. BMC's Organizational Structure

At all times relevant to this case, Dr. Ravin Davidoff held the role of BMC's Chief Medical Officer and Dr. James Moses worked as BMC's Chief Quality Officer.[9]  As Chief of Radiology, Dr. Soto oversees the Department of Radiology, which includes several subspecialties.[10]  One of those subspecialties is interventional radiology ("IR").[11]  Dr. Rajendran "Raj" Vilvendhan served as the Chief of the Division of IR between 2011 and 2020.[12]

### 1. Quality & Safety In Interventional Radiology

In 2017, in an effort to address the needs of BMC's growing IR practice, Dr. Soto, Dr. Moses, Dr. Davidoff, and Scott Friedman, BMC's Chief Risk Officer, decided to create the position of Director of Quality & Safety in IR.[13]  At the time, IR was a relatively new and evolving discipline for which there were specific risks.[14]  As opposed to diagnostic radiologists,

---

[4] Def. SOF ¶¶ 5, 92; Pl. Resp. ¶¶ 5, 92.
[5] Def. SOF ¶ 1; Pl. Resp. ¶ 1.
[6] Id.
[7] Id.
[8] Id.
[9] Def. SOF ¶ 4; Pl. Resp. ¶ 4.
[10] Def. SOF ¶¶ 1, 2; Pl. Resp. ¶¶ 1, 2.
[11] Id.
[12] Def. SOF ¶ 3; Pl. Resp. ¶ 3.
[13] Def. SOF ¶ 4; Pl. Resp. ¶ 4.
[14] Id.

who used non-invasive scanning technology, interventional radiologists used minimally invasive image-guided procedures.[15]

In the fall of 2017, Dr. Soto interviewed Dr. O'Horo for the position of Director of Quality and Safety in IR.[16]  During the interview, Dr. Soto expressed dissatisfaction with then IR Division Chief, Dr. Vilvendhan, and suggested that the position might be imminently available and Dr. O'Horo would be considered for the role.[17]  Dr. O'Horo acknowledges that "[n]o promises were made" about the position, and Dr. Vilvendhan was qualified for the role.[18] BUMCR subsequently offered Dr. O'Horo the position of Director of Quality & Safety in IR, which she accepted in February 2018.[19]

In that position, Dr. O'Horo understood that, as part of her role, she was expected to develop the quality and safety programs for the divisions of IR and Neuro-interventional Radiology.[20]  In particular, she was tasked with the following:

- Developing an on-boarding program for new physicians;

- Developing and overseeing the physician evaluation processes, specifically the Ongoing Professional Practice Evaluation ("OPPE") and Focused Professional Practice Evaluation ("FPPE") programs;

- Reviewing and investigating safety reports that were filed in a computer system called STARS;

- Instituting quality and safety protocols;

- Responding to concerns when a complication related to a procedure arose; and

---

[15] Def. SOF ¶ 2; Pl. Resp. ¶ 2.
[16] Def. SOF ¶ 6; Pl. Resp. ¶ 6; Pl. SOF ¶ 104; Def. Resp. ¶104.
[17] Id.
[18] Id.; Def. SOF ¶ 7; Pl. Resp. ¶ 7.
[19] Def. SOF ¶ 5; Pl. Resp. ¶ 5.
[20] Def. SOF ¶ 8; Pl. Resp. ¶ 8; Pl. SOF ¶ 106; Def. Resp. ¶ 106.

- Other matters related to quality and safety in the IR Division.[21]

In addition to her work as Director of Quality and Safety in IR, Dr. O'Horo performed regular duties as a practicing interventional radiologist at BMC.[22]

Other physicians and leaders shared responsibility with Dr. O'Horo for quality and safety within the IR Division.[23]   As the Division Chief of IR, Dr. Vilvendhan was responsible for "the overall conduct of the . . . Division," specifically including:

> all clinically related activities of the [Division]; . . . continuing surveillance of the professional performance of all individuals in the [Division] who have delineated clinical privileges; . . . the development and implementation of policies and procedures that guide and support the provision of care, treatment and services; . . . [and] the continuous assessment and improvement of the quality of care.[24]

As Chief Quality Officer, Dr. Moses also played a significant role in patient quality and safety within IR.[25]   The undisputed facts show that several individuals had overlapping authority for quality and safety for IR.

### C. The STARS Reporting System

At all times during Dr. O'Horo's employment, BMC used a system called STARS to track medical incidents and unusual patient-related occurrences.[26]   Under BMC policy during Dr. O'Horo's tenure, a STARS report was supposed to be filed by any individual who identified or was involved in a reportable event, as soon as possible but no later than the end of the reporter's shift.[27]   The reporter's immediate supervisor was responsible for ensuring that an incident report

---

[21] Id. Dr. O'Horo disputes this statement of fact to the extent that the Defendants suggest that her responsibilities included ensuring compliance with BMC's STARS policy.  She maintains that the policy places that responsibility on the reporter's immediate supervisor.  Pl. Resp. ¶ 8.
[22] Docket No. 1 ¶ 26.
[23] Def. SOF ¶ 9; Pl. Resp. ¶ 9.
[24] Id.; Docket No. 67-14 at 2.
[25] Def. SOF ¶ 10; Pl. Resp. ¶ 10.
[26] Def. SOF ¶ 18; Pl. Resp. ¶ 18.
[27] Def. SOF ¶ 19; Pl. Resp. ¶ 19.

was completed in a timely manner and for following up with the Quality and Patient Safety

Department to initiate an investigation.[28]  All follow-up activities were supposed to be logged in

the STARS online incident reporting system.[29]

    Dr. O'Horo testified that she was not aware that there was a BMC policy regarding

STARS reporting.[30]  She believed instead that there was "no consistent use of the STARS system

for reporting complications," so she logged reports of IR complications caused by all physicians

in the division on an Excel spreadsheet that was maintained on a BMC computer.[31]

    D.  <u>Incidents Prior To October 25, 2019</u>

       1.  <u>Issues Relating To Dr. Higgins</u>

    During Dr. O'Horo's tenure at BMC, both male and female employees lodged complaints

about Dr. Higgins' behavior.[32]  For example, in February 2018, Stephanie Martinez, the nursing

manager with responsibility for the IR Division, complained to Dr. Soto on behalf of herself and

her staff about Dr. Higgins's technical capabilities, clinical judgment, and demeanor.[33]  Nurse

Martinez decided to bring these concerns to Dr. Soto because Dr. Higgins' actions impacted staff

morale.[34]  Dr. Leo Campos, a doctor in the IR department, also complained to BMC leadership

about his interactions with Dr. Higgins, characterizing the environment and work culture as

negative.[35]

    Dr. O'Horo maintains that throughout her employment, Dr. Higgins questioned her

knowledge of anatomy in a condescending manner in front of residents and other staff members,

---

[28] <u>Id.</u>
[29] <u>Id.</u>
[30] Def. SOF ¶ 23; Pl. Resp. ¶ 23.
[31] Def. SOF ¶¶ 23, 24; Pl. Resp. ¶¶ 23, 24; Pl. SOF ¶ 125; Def. Resp. ¶ 125.
[32] Def. SOF ¶¶ 12, 80; Pl. SOF ¶¶ 12, 80.
[33] Def. SOF ¶ 12; Pl. SOF ¶ 12.
[34] <u>Id.</u>
[35] Def. SOF ¶ 80; Pl. SOF ¶ 80.

which caused her embarrassment.[36]

In addition, at multiple points in 2018 and 2019, Dr. Higgins made mistakes during patient procedures.[37]  On June 8, 2018, Dr. O'Horo told Dr. Soto of "ongoing concerns all around" regarding Dr. Higgins and suggested that his procedures be observed so that contemporaneous feedback on technical skills and interpersonal expectations could be provided.[38]  Dr. Soto's response included the following: "Thanks for your diligence and hard work.  I suggest we meet (hopefully Monday) to discuss the points below, especially those pertaining to Mikhail."[39]  Dr. O'Horo characterized this as a "standard response" to her complaints about Dr. Higgins but nevertheless believed Dr. Soto to be insincere.[40]

On August 31, 2018, Dr. O'Horo complained to Dr. Soto about Dr. Higgins' behavior, specifically that he was unprofessional to her in front of residents and called his behavior "mansplaining."[41]  Dr. O'Horo maintains that Dr. Higgins did not speak to male physicians in the department that way.[42]  She contends that Dr. Soto did nothing in response to her concerns.[43] The Defendants counter that Dr. Soto addressed Dr. O'Horo's concerns by: (1) requiring Dr. Higgins to undergo formal counseling and coaching; (2) conducting a review of Dr. Higgins's procedures; and (3) putting Dr. Higgins on an FPPE program.[44]

Together, Dr. Soto and Dr. O'Horo created a plan to "shadow" Dr. Higgins.[45]  Dr. O'Horo also met with Dr. Higgins to address the recent incidents that had prompted complaints

---

[36] Pl. SOF ¶ 118; Def. Resp. ¶ 118.
[37] Pl. SOF ¶¶ 111, 115, 132-134; Def. Resp. ¶¶ 111, 115, 132-134.
[38] Def. SOF ¶ 14; Pl. Resp. ¶ 14; Docket No. 67-16 at 1-2.
[39] Id.; Docket No. 67-16 at 1.
[40] Id.; Docket No. 67-2 at 17.
[41] Pl. SOF ¶ 115; Def. Resp. ¶ 115; Docket No. 73-9 at 3.
[42] Pl. SOF ¶ 115; Def. Resp. ¶ 115.
[43] Pl. SOF ¶ 116.
[44] Def. Resp. ¶ 116; Docket No. 73-37 at 5.
[45] Def. SOF ¶ 15; Pl. Resp. ¶ 15; Docket No. 67-17 at 1-2.

from staff.[46]  She concluded: "It will take some time to build up trust but hopefully we can coach him around communication issues in the meantime and the observation period will hopefully help with this."[47]  Dr. Soto responded, "I like your approach, Susan."[48]  Dr. O'Horo testified regarding this exchange: "I think we were all optimistic that, perhaps, the tone could be reset with the right systems in place."[49]

Dr. Soto suggested that Dr. Higgins be included in the FPPE process that Dr. O'Horo had designed along with other newly hired interventional radiologists.[50]  This process was started, but Dr. O'Horo complained that there was pushback from Dr. Higgins on completing some of the observations that were required by the FPPE.[51]

In the fall of 2018, while discussing the number of safety-related issues related to Dr. Higgins, Dr. Vilvendhan told Dr. O'Horo that Dr. Soto might listen to her because she was a woman.[52]  She complained about the comment to Dr. Soto.[53]

On January 10, 2019, Dr. Soto privately asked Dr. Vilvendhan to investigate a case identified by Dr. O'Horo concerning Dr. Higgins' placement of an incorrect device "before we do anything else."[54]  Dr. Vilvendhan ultimately agreed with Dr. O'Horo's assessment that the mistake could have been avoided.[55]

On January 17, 2019, Dr. O'Horo brought her concerns regarding Dr. Higgins to Dr.

---

[46] Id.; Docket No. 67-17 at 1.
[47] Id.
[48] Id.
[49] Id.
[50] Def. SOF ¶ 16; Pl. Resp. ¶ 16; Pl. SOF ¶ 113; Def. Resp. ¶ 113.
[51] Id.
[52] Pl. SOF ¶ 112; Def. Resp. ¶ 112; Docket No. 73-1 at 13-14.
[53] Pl. SOF ¶ 126; Def. Resp. ¶ 126.
[54] Pl. SOF ¶ 127; Def. Resp. ¶ 127.
[55] Id.

Moses, then BMC's Chief of Quality and Safety.[56]  At his request, on January 18, 2019, Dr.

O'Horo emailed Dr. Moses an Excel spreadsheet containing reports of complications caused by

Dr. Higgins.[57]  In the body of the email, she wrote:

> Attached please find some of the more serious complications which I find
> problematic.  This is not a complete or comprehensive list of complications.  It does
> cover the majority of complications which are brought directly through safety
> reports or (mostly) indirectly to my attention.  I have indicated the ones which I
> think meet criteria as an SRE [serious reportable event].  I do not know which of
> these events, if any, have been reported.  There are many other complications which
> I have not listed here.[58]

Dr. Moses was concerned by the number of incidents that Dr. O'Horo had logged

regarding Dr. Higgins, as well as the format in which she presented her concerns.[59]  Dr. Moses

testified:

> I think that the fact that there are significant complications that would warrant
> formal submission to the patient safety team via the STARS software system as
> previously mentioned and that I do not believe these cases were submitted by Dr.
> O'Horo, and I was very concerned that she was tracking these events by herself in
> an Excel file without submitting them for multidisciplinary review by the patient
> safety steering committee.[60]

Dr. Moses was also concerned by Dr. O'Horo's focus on Dr. Higgins to the exclusion of other IR

providers.[61]  His assessment that Dr. O'Horo had adopted a "punitive" approach to Dr. Higgins

was informed by Dr. O'Horo's insistence during their meetings that Dr. Higgins be terminated

from his employment and removed from BMC.[62]

Dr. Moses met with Dr. Davidoff to discuss Dr. O'Horo's concerns.[63]  In a subsequent

---

[56] Pl. SOF ¶ 128; Def. Resp. ¶ 128.

[57] Def. SOF ¶ 24; Pl. Resp. ¶ 24; Pl. SOF ¶ 128; Def. Resp. ¶ 128.

[58] Id.; Docket No. 68-2 at 1.

[59] Def. SOF ¶ 25; Pl. Resp. ¶ 25.

[60] Def. SOF ¶ 26; Pl. Resp. ¶ 26; Docket No. 67-5 at 11.

[61] Def. SOF ¶ 29; Pl. Resp. ¶ 29.

[62] Def. SOF ¶ 30; Pl. Resp. ¶ 30.

[63] Def. SOF ¶ 31; Pl. Resp. ¶ 31.

email to Dr. Soto about this conversation, Dr. Moses characterized Dr. Davidoff as describing "interactive and emotional intelligence issues Susan is having" and suggested that these issues "make the issue with Mikhail not so clear."[64]  Dr. Moses was "specifically concerned [about] Dr. O'Horo's lack of situational awareness and self-awareness, as to why she did not perceive her processes flawed and potentially biased against Dr. Higgins."[65]  Nevertheless, Dr. Moses told Dr. Soto that the spreadsheet "raise[d] alarms for me about [Dr. Higgins's] competency."[66]  Dr. Moses suggested that he and Dr. Soto meet to discuss the issue with the goal of supporting Dr. Soto's management of the issues within his department.[67]

In September 2019, a team, including Dr. Soto, selected Dr. Higgins as the Medical Student Clerkship Director, despite his behavioral issues with residents that were known to Dr. Soto.[68]  Neither Dr. Higgins nor Dr. O'Horo applied for the position.[69]  Shortly thereafter, a different male physician, Dr. Ezra Burch, was appointed to the position of Director of Early Specialization in IR.[70]  Dr. Burch did not have any other leadership role in the IR department.[71]  The Defendants assert that these roles were not offered to Dr. O'Horo because she already had a leadership position within the department and she had never expressed an interest in the education of students while at BMC.[72]  After Dr. Burch left BMC, Dr. Higgins resumed the role of Director of Early Specialization in IR, and held that simultaneously with the role of Medical Student Clerkship Director.[73]

---

[64] Id.; Def. SOF ¶ 62; Pl. Resp. ¶ 62; Docket No. 67-20 at 1.
[65] Id.; Docket No. 67-5 at 17.
[66] Def. SOF ¶ 32; Pl. Resp. ¶ 32.
[67] Id.
[68] Def. SOF ¶ 73; Pl. Resp. ¶ 73; Pl. SOF ¶ 139; Def. Resp. ¶ 139.
[69] Id.
[70] Def. SOF ¶ 74; Pl. Resp. ¶ 74.
[71] Id.
[72] Id.; Pl. SOF ¶ 141; Def. Resp. ¶ 141.
[73] Pl. SOF ¶ 140; Def. Resp. ¶ 140.

2. <u>The Whistleblower Letter</u>

On September 13, 2019, Dr. O'Horo sent a letter dated September 11, 2019 (the "Whistleblower Letter") to Dr. Davidoff and Mr. Friedman describing her concerns about Dr. Higgins along with an updated spreadsheet of complications caused by him.[74]  In the letter, Dr. O'Horo requested "an objective investigation as [she had] concerns that Dr. Soto and Dr. Vilvendhan are not able to be impartial in this matter and may even be protecting Dr. Higgins."[75] She also wrote: "I am reporting these matters to you under Massachusetts General Laws, Chapter 149, Section 187, because I believe they pose a risk to our patients and to public health."[76]

Dr. Davidoff responded later that day to Dr. O'Horo: "We take this type of information and report very seriously."[77]  Dr. Davidoff testified that BMC quickly went to work to develop an action plan in response to Dr. O'Horo's concerns.[78]  Dr. Davidoff met with Dr. O'Horo, at which she brought up a "wide range of topics" including Dr. Higgins's performance, Dr. Soto's leadership style, and the Radiology Department in general.[79]  Dr. Davidoff promised to follow up on the issues raised by Dr. O'Horo.[80]

After September 2019, BMC created an action plan that involved developing internal and external review processes to evaluate IR at BMC.[81]  Dr. Davidoff, Dr. Moses, and Laura Harrington, BMC's Executive Director for Quality and Patient Safety, met with Dr. O'Horo on October 3, 2019, to discuss Dr. O'Horo's letter and supporting documentation in detail,

---

[74] Def. SOF ¶ 34; Pl. Resp. ¶ 34.
[75] <u>Id.</u>; Docket No. 67-22 at 2.
[76] <u>Id.</u>
[77] Def. SOF ¶ 35; Pl. Resp. ¶ 35; Docket No. 67-23 at 1.
[78] Def. SOF ¶ 35; Pl. Resp. ¶ 35; Docket No. 67-7 at 3.
[79] Def. SOF ¶ 36; Pl. Resp. ¶ 36.
[80] <u>Id.</u>
[81] Def. SOF ¶ 39; Pl. Resp. ¶ 39; Docket No. 67-7 at 4.

including each of the cases Dr. O'Horo had listed.[82]

On October 3 and 4, 2019, Dr. Campos attended a two-day meeting at a hospital in Buenos Aires, Argentina.[83]  Dr. O'Horo contends this opportunity should have gone to her instead.[84]

 E. <u>Incidents After October 25, 2019</u>

On October 30, 2019, Dr. Vilvendhan emailed Dr. O'Horo about a "near miss," based on his review of Dr. Higgins' cases.[85]  Dr. O'Horo forwarded the email to Dr. Moses and asked "[w]hy is he 'believed' and my reviews all along have not?"[86]

In early November 2019, Dr. Vilvendhan, spurred on by Dr. Soto's request that he "keep an eye" on Dr. Higgins, performed a review of percutaneous nephrostomy cases conducted by Dr. Higgins.[87]  At around the same time, Dr. O'Horo met with Dr. David McAneny, the Vice Chair of the Department of Surgery, to discuss safety concerns regarding Dr. Higgins.[88]  Dr. Vilvendhan also attended the meeting, even though the discussion concerned quality and safety issues that fell within the scope of Dr. O'Horo's responsibilities.[89]  Dr. O'Horo testified that Dr. McAneny concluded the meeting by asking if she would "buy [him] a six pack" if he "fix[ed] this" for her.[90]

On November 26, 2019, BMC announced that it had selected Dr. Vilvendhan to perform an internal review of all the radiology attendings.[91]  Dr. O'Horo complained to Dr. Moses and

---

[82] Def. SOF ¶ 37; Pl. Resp. ¶ 37.
[83] Def. SOF ¶ 56; Pl. Resp. ¶ 56; Docket No. 67-1 ¶ 7.
[84] <u>Id.</u>
[85] Pl. SOF ¶ 135; Def. Resp. ¶ 135.
[86] <u>Id.</u>
[87] Pl. SOF ¶ 144; Def. Resp. ¶ 144.
[88] Pl. SOF ¶ 145; Def. Resp. ¶ 145.
[89] <u>Id.</u>
[90] <u>Id.</u>
[91] Pl. SOF ¶ 146; Def. Resp. ¶ 146.

Dr. Davidoff about the internal review process and noted her concerns that Dr. Vilvendhan was biased.[92]  In meetings with Dr. Moses, Dr. O'Horo also expressed that she felt that Dr. Vilvendhan's review "usurp[ed] her role as [quality and patient safety] lead."[93]  Dr. Leo Campos also wrote to Dr. Soto to complain about the selection of Dr. Vilvendhan.[94]  BMC announced its intent to engage an outside person to perform a review of the division, but it did not involve Dr. O'Horo in the process of vetting and hiring this group.[95]

Dr. O'Horo further alleges that between the second half of January 2020 and February 2020, she was "scheduled to be observed seven more times than any of the male physicians in the department."[96]  At oral argument, Dr. O'Horo's counsel conceded that based on the documents provided as backup for this assertion, she could not explain how the "seven more times" number was reached.  But she maintained that Dr. O'Horo was scheduled to be observed more than her male colleagues.  The Defendants state that Dr. Vilvendhan only observed one of Dr. O'Horo's procedures and ten for Dr. Higgins.[97]

F.  Dr. O'Horo's Departure From BMC

On December 26, 2018, Dr. O'Horo applied for an interventional radiologist position at South Shore Hospital.[98]  She was interested in the position because she knew the other interventional radiologists working there and the location was close to her home.[99]  Between February and April 2019, Dr. O'Horo inquired about various other job openings at different

---

[92] Pl. SOF ¶ 148; Def. Resp. ¶ 148.
[93] Def. SOF ¶ 40; Pl. Resp. ¶ 40.
[94] Pl. SOF ¶ 151; Def. Resp. ¶ 151.
[95] Pl. SOF ¶ 149; Def. Resp. ¶ 149.
[96] Def. SOF ¶ 77; Pl. Resp. ¶ 77; Pl. SOF ¶ 156; Def. Resp. ¶ 156.
[97] Def. SOF ¶ 77; Pl. Resp. ¶ 77.
[98] Def. SOF ¶ 82; Pl. Resp. ¶ 82.
[99] Id.

hospitals in the area.  She obtained at least one interview.[100]

On January 7, 2020, Dr. O'Horo and Dr. Campos sent the following texts:

Dr. O'Horo: Tufts. April 1. 🎉🎉 Don't say anything to anyone though

Dr. Campos: Nice! Is that your start date? You Rock!

Dr. O'Horo: Depending on credentialing. I am not going to give notice to end of month though [sic]. Still hoping they fire me.[101]

On January 15, 2020, Dr. O'Horo texted Dr. Campos:

I'll tell you more Friday in person Hass [sic] to do with my legal case but I am likely giving notice in the near term. Also I had a much better job lead today and I'm interviewing next week. Hospital cannot know that though.

I just don't want them knowing anything about my personal life or any of the personal stresses that I had last year because they can use that against me in court when I argue for money. They may say that my personal circumstances were [sic] I was under duress. But as we both know the hospital was much worse than anything I endured in my personal life. . . .[102]

On January 20, 2020, Dr. O'Horo sent a letter to Dr. Davidoff, Dr. Moses, and Dr. Soto in which she stated that "BMC . . . has constructively discharged me effective immediately," claiming that "the working conditions have become so intolerable that I can no longer work at BMC."[103]  On the same day, Dr. O'Horo texted Dr. Wendy Gross: "I resigned today."[104]  She also texted Dr. Campos: "So glad I was not there today. Picked a perfect time to exit.  It would have been pretty stressful [t]o have [Dr. Vilvendhan] do his crappy supervision on a difficult patient."[105]  On January 23, 2020, Dr. Soto sent the following text to Dr. Campos: "Again between you and me one thing as mean as it is I was hoping to accomplish was to cause [Dr.

---

[100] Def. SOF ¶¶ 83-85; Pl. Resp. ¶¶ 83-85.
[101] Def. SOF ¶ 89; Pl. Resp. ¶ 89; Docket No. 67-39 at 1.
[102] Def. SOF ¶ 91; Pl. Resp. ¶ 91; Docket No. 67-39 at 6-7.
[103] Def. SOF ¶ 92; Pl. Resp. ¶ 92; Docket No. 67-40.
[104] Def. SOF ¶ 93; Pl. Resp. ¶ 93; Docket No. 67-42 at 4.
[105] Def. SOF ¶ 93; Pl. Resp. ¶ 93; Docket No. 67-39 at 11.

Soto] embarrassment.  An abrupt departure amidst other departures and DPH raises huge red flags [a]nd speaks volumes."[106]

III.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" when a rational factfinder could resolve it in either direction.  <u>Borges ex rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 4 (1st Cir. 2010) (citation omitted).  A fact is "material" when its (non) existence could change a case's outcome.  <u>Id.</u> (citation omitted).  This Court takes the facts from the parties' summary judgment filings and from the record at large where appropriate.  <u>See</u> <u>Evergreen Partnering Grp., Inc. v. Pactiv Corp.</u>, 832 F.3d 1, 4 n.2 (1st Cir. 2016).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  <u>See id.</u> at 324.  "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial.  <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir. 1993) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).

The Court "must scrutinize the evidence in the light most agreeable to the nonmovants, who are entitled to the benefit of all reasonable inferences therefrom." <u>Ahern v. Shinseki</u>, 629 F.3d 49, 53–54 (1st Cir. 2010) (citing <u>Cox</u>, 391 F.3d at 29).  "A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations,

---

[106] Def. SOF ¶ 95; Pl. Resp. ¶ 95; Docket No. 67-39 at 13.

improbable inferences, acrimonious invective, or rank speculation." Id. (citations omitted). Indeed, "[a]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." McRory v. Spigel (In re Spigel), 260 F.3d 27, 31 (1st Cir. 2001) (citation omitted). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

IV. DISCUSSION

    A.    Gender Discrimination Claims

Dr. O'Horo brings gender discrimination claims both under Title VII and Massachusetts law. Docket No. 1 at 31-33.

    1.    Statute Of Limitations

The Defendants have moved for summary judgment on the basis that Dr. O'Horo's federal and state discrimination claims are time barred. "Discrimination claims under Title VII and Chapter 151B must be pursued administratively prior to the filing of a lawsuit." Harrington v. Lesley Univ., 554 F. Supp. 3d 211, 221 (D. Mass. 2021). When a plaintiff chooses to exhaust her administrative remedies through a state or local agency, she must do so "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). "The applicable procedure . . . calls for counting back [300] days to determine the earliest possible date that an unlawful employment action could have occurred and still be actionable." Savage v. City of Springfield, No. 3:18-CV-30164-KAR, 2021 WL 858409, at *5 (D. Mass. Mar. 8, 2021) (citation and internal quotation marks omitted) (alteration in original); see also Salomon v. Massachusetts Hous. Fin. Agency, No. 22-CV-10181-ADB, 2023 WL

2588334, at *7-8 (D. Mass. Mar. 21, 2023).

On August 20, 2020, Dr. O'Horo filed charges with the Massachusetts Commission Against Discrimination ("MCAD") and the United States Equal Employment Opportunity Commission ("EEOC").  Docket No. 1 ¶ 12.  Unless the statute of limitations is otherwise tolled, discrete acts of employment discrimination must have occurred on or after October 25, 2019 (300 days prior to Dr. O'Horo's filing of her MCAD and EEOC complaints) to form the basis for the Defendants' liability for Dr. O'Horo's disparate treatment claim.

        a.  Supreme Judicial Court Tolling Order

Through a series of orders, the Massachusetts Supreme Judicial Court ("SJC") tolled "[a]ll civil statutes of limitations. . . from March 17, 2020, through June 30, 2020."  Supreme Judicial Court, Third Updated Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 (Coronavirus) Pandemic, No. OE-144, ¶ 13 (June 24, 2020) (the "SJC Orders").

Dr. O'Horo argues that the SJC's actions provided her with an additional 106 days. Therefore, she argues that the relevant date for her Title VII and Chapter 151B claims should be July 11, 2019, not October 25, 2019.  Docket No. 80 at 13-14.  This argument is not persuasive with respect to her federal or state law claims.

First, "as a general rule . . . a state supreme court has no authority over federal courts in their application of federal law."  Harrington v. Lesley Univ., 554 F. Supp. 3d 211, 225-26 (D. Mass. 2021).

> While the MCAD has initial jurisdiction over Title VII charges filed within the Commonwealth, the EEOC's 'deferral policy' does not (and cannot) thereby supplant the statute of limitations fixed by Congress under federal law.  The processing of discrimination claims by state entities is a matter of federal law, not a displacement of federal law.

Id. at 225 (citing 29 C.F.R. § 1601.13(a)(3)(ii)).  Accordingly, I find that the SJC Order did not

toll the statute of limitations for Dr. O'Horo's Title VII claim.

Second, on July 11, 2023, in <u>Dunn v. Langevin</u>, the SJC clarified that its orders did not apply to the time limits associated with M.G.L. c. 151B, including claims that required exhaustion before the MCAD.  <u>See</u> <u>Dunn v. Langevin</u>, No. SJC-13364, 2023 WL 4441057, at *1 (Mass. July 11, 2023).  The SJC explained that because the MCAD is an executive branch agency, not a court of inferior jurisdiction, its orders did not apply to the agency's time limits. The SJC noted that the MCAD had its own tolling process.  <u>See also</u> <u>Harrington</u>, 554 F. Supp. 3d at 226.

As Judge Woodlock explained:

The MCAD's pandemic tolling rule is the relevant policy to apply in this case.  State law required [the plaintiff] to file a complaint within 300 days with the MCAD, not with the courts. . . . Pursuant to its rule promulgating authority, . . . the MCAD decided to toll the statute of limitations on the complaints before it on a case-by-case basis.

<u>Id.</u> (citing M.G.L. c. 151B, §§ 3(5), 5)).  Here, Dr. O'Horo has provided no evidence that the MCAD issued any such decision in her case.  Accordingly, I find that the statute of limitations for Dr. O'Horo's Chapter 151B claim has not been tolled.

## 2.   Underlying Gender Discrimination Claims

Pursuant to Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  Under Massachusetts law, it is unlawful "[f]or an employer, . . . because of the . . . sex . . . of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . ."  M.G.L. c. 151B § 4(1).  Because courts apply the same analysis to state and federal

18

discrimination claims, this Court will analyze O'Horo's claims collectively.  See Frankina v. First Nat'l Bank of Boston, 801 F. Supp. 875, 880 (D. Mass. 1992).

Gender discrimination can occur in different ways.  Under a disparate treatment theory, a plaintiff must show that she was a victim of intentional discrimination.  Ahern, 629 F.3d at 54. She bears the burden of showing that she was "subjected to different treatment than persons similarly situated in all relevant aspects."  Ortiz v. Fed. Bureau of Prisons, 290 F. Supp. 3d 96, 103 (D. Mass. 2017).  Federal and state law protections also extend to harassment of a plaintiff based on her gender, which can create "a gender-based hostile work environment."  Soni v. Wespiser, 404 F. Supp. 3d 323, 329-30 (D. Mass. 2019) (citation omitted).  In this case, Dr. O'Horo claims both types of discrimination.  Docket No. 1 at 31-32.

a.      Disparate Treatment

Where, as here, the plaintiff has no direct evidence of discrimination, both federal and state courts rely on the burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), in determining whether the plaintiff has shown discrimination.  Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, at 5 (1st Cir. 2000).  Under McDonnell Douglas, a plaintiff must first establish a prima facie case for disparate treatment discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her job; (3) she has suffered an adverse employment action by her employer; and (4) there is "some evidence of a causal connection between her membership in a protected class and the adverse employment action . . . ."  Luceus v. Rhode Island, 923 F.3d 255, 258 (1st Cir. 2019) (citation and internal quotation marks omitted).  The initial burden is not onerous.  Caraballo-Caraballo v. Correctional Adm., 892 F.3d 53, 57 (1st Cir. 2018).

Once the plaintiff establishes a prima facie case, "the burden shifts to the employer to articulate some 'legitimate, nondiscriminatory reason' for its employment action."  Feliciano de

la Cruz, 218 F.3d at 5 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  "[T]he defendant must

clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if

believed by the trier of fact, would support a finding that unlawful discrimination was not the

cause of the employment action."  <u>Id.</u> at 5–6.  Once the employer offers a nondiscriminatory

reason for its action, the burden shifts back to the plaintiff to show that the reason proffered was

a pretext for the discriminatory decision.  <u>Id.</u>

 In the context of a summary judgment motion, "the jurisprudence of Rule 56 takes hold

and the McDonnell Douglas burden-shifting standard framework must comport with the rule."

<u>Mesnick v. General Electric Co.</u>, 950 F.2d 816, 824 (1st Cir. 1991).  As the First Circuit has

explained:

> If the plaintiff has failed to limn a prima facie case, the inference of discrimination
> never arises, and the employer's motion for summary judgment will be granted.  If
> the plaintiff has made his prima facie case, and the employer has not offered a
> legitimate, nondiscriminatory reason to justify the adverse employment action, then
> the inference of discrimination created by the prima case persists, and the
> employer's attempt to secure summary judgment should be rebuffed.  When the
> struggle has progressed to the third and final phase of burden-shifting, however,
> then the <u>McDonnell Douglas</u> framework falls by the wayside. Because this
> phenomenon is much misunderstood, we pause briefly to explicate it.
>
> It is settled that the presumption arising from a discrimination plaintiff's prima facie
> case vanishes once the employer has articulated a legitimate, nondiscriminatory
> reason for dismissing the employee.   At that juncture, the ultimate question
> becomes whether, on all of the evidence of record, a rational factfinder could
> conclude that [gender] was a determining factor in the employer's decision.  That
> is to say, so long as the employer's proffered reason is facially adequate to
> constitute a legitimate, nondiscriminatory justification for the employer's actions,
> the trial court's focus in deciding a Rule 56 motion must be on the ultimate
> question, not on the artificial striations of the burden shifting framework.
>
> Put another way, under conventional summary judgment practice, a plaintiff must
> establish at least a genuine issue of material fact on every element essential to his
> case in chief.  Hence, in a case where the first two steps of the <u>McDonnell Douglas</u>
> pavane have been satisfactorily choreographed, a plaintiff must offer some
> minimally sufficient evidence, direct or indirect, both of pretext and of the
> employer's discriminatory animus to prevail in the face of a properly drawn Rule
> 56 motion.  Once the burden-shifting framework has run its course, we think that

> courts should not unduly complicate matters, whether on summary judgment or on
> motion for directed verdict at trial's end, 'by applying legal rules which were
> devised to govern the 'basic allocation of burdens and order of proof' in deciding
> this ultimate question.'

Id. at 824–25 (internal citations and footnotes omitted).

Dr. O'Horo, as a female, is a member of a protected class.  There is also no dispute that she is qualified for the position.  Dr. O'Horo's claim fails, however, with respect to whether she suffered an adverse employment action.

Determining whether an action is materially adverse is a case-by-case inquiry and must be cast in objective terms.  Blackie v. State of Me., 75 F.3d 716, 725 (1st Cir. 1996). "Workplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of materially adverse employment action."  Id.  Such acts "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  Burns v. Johnson, 829 F.3d 1, 10 (1st Cir. 2016) (citations and internal quotation marks omitted).  When an employee is reassigned to a position with "significantly different responsibilities," the change may be actionable.  Id.  For example, a transfer of seventy-five percent of an employee's responsibilities to others and an alteration in work to only menial tasks and clerical duties resulted in a finding of an adverse employment action.  Id. at 10-11.

O'Horo alleges four adverse employment actions: (1) denial of a visiting professorship in October 2019[107]; (2) non-selection for a Medical Student Clerkship Director position in September 2019[108]; (3) non-selection for Director of Early Specialization in IR in September

---

[107] The record does not show that this was, in fact, a visiting professorship.  Rather, it shows that it was a two-day meeting in Argentina on October 3 and 4, 2019.  Def. SOF ¶ 56; Pl. Resp. ¶ 56; Def. Resp. ¶ 143; Docket No. 77-1 at 1-2.
[108] Pl. SOF ¶ 139; Def. Resp. ¶ 139.

2019[109]; and (4) constructive demotion, which led to her constructive discharge.  Docket No. 80 at 15.

Because this Court has found that incidents occurring prior to October 25, 2019 fall outside the statute of limitations for disparate treatment claims, it will only consider whether Dr. O'Horo's allegations of constructive demotion and discharge constitute adverse employment actions.

In her memorandum, Docket No. 80 at 16, she alleges that the following acts subjected her to "constructive demotion, which resulted in her constructive discharge":

- Dr. Soto repeatedly asked Dr. Vilvendhan to independently investigate safety concerns that Dr. O'Horo had raised regarding Dr. Higgins.[110]

- In early November 2019, Dr. Vilvendhan, spurred on by Dr. Soto's request that he "keep an eye" on Dr. Higgins, performed a review of percutaneous nephrostomy cases conducted by Dr. Higgins.[111]

- Dr. Soto asked Dr. Vilvendhan to accompany Dr. O'Horo to her meeting with Dr. McAneny regarding quality and safety issues that fell within the scope of Dr. O'Horo's responsibilities.[112]

- In November 2019, BMC announced that Dr. Vilvendhan had been appointed to review all of the physicians within the IR department, even though it was Dr. O'Horo's job "to set up a formal process for reviewing complications and to document those results."[113]

- BMC's leadership excluded Dr. O'Horo entirely from the process to develop the internal review even though the form used for the review was developed by Dr. O'Horo.[114]

- Between January 2020 and February 2020, Dr. O'Horo was scheduled to be observed by Dr. Vilvendhan seven more times than Dr. Higgins or any other male colleague in the division.[115]

- Dr. O'Horo was excluded from the decision to hire an external reviewer, was not

---

[109] Def. SOF ¶ 74; Pl. Resp. ¶ 74; Docket No. 67-13 at 3.
[110] Pl. SOF ¶¶ 135, 144; Def. Resp. ¶¶ 135, 144.
[111] Pl. SOF ¶ 144; Def. Resp. ¶ 144.
[112] Pl. SOF ¶ 145; Def. Resp. ¶ 145.
[113] Pl. SOF ¶ 146; Def. Resp. ¶ 146; Docket No. 73-58 at 13.
[114] Pl. SOF ¶¶ 147, 148; Docket No. 73-18 at 2-4.
[115] Pl. SOF ¶ 156.

consulted about the external review process, and was not engaged to discuss which cases should be submitted for external review.[116]

Dr. O'Horo contends that these acts stripped her of any substantive job responsibilities and left her holding the position of Director of Quality and Safety in name only.  Docket No. 80 at 17.

### i.   Constructive Demotion

Dr. O'Horo correctly maintains that several circuits have recognized constructive demotion as a viable employment action under federal law.  Docket No. 80 at 16 (citing to Feeney v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 717-19 (8th Cir. 2003); Simpson v. Borg-Warner Auto., Inc. 196 F.3d 873, 876 (7th Cir. 1999); Sharp v. City of Houston, 164 F.3d 923, 933-934 (5th Cir. 1999)).  The First Circuit, however, has not recognized such a claim.  In Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218 (1st Cir. 1989), the First Circuit declined "to adopt the short-hand phrase because when a bureaucrat is denied responsibility and perquisites appropriate to the position occupied, it does not necessarily mean that he or she has been accorded those appropriate to a lower level."  Id.  In its view, "a 'constructive demotion' inquiry would simply obfuscate matters by raising the distracting question of the level to which the plaintiff has descended."  Id.

Massachusetts courts have recognized the claim, but in situations vastly different than the instant case.  Under the demotion line of constructive discharge cases, Massachusetts courts have found constructive discharge "if the employer effectively [gives] the employee's job to someone else . . . transferred the employee's responsibilities leaving him with no authority; or reassigned the employee to a nonexistent job."  Flint v. City of Boston, 94 Mass. App. Ct. 298, 308 (2018) (alterations in original); see also Rubin v. Household Comm. Fin. Servs., Inc., 51 Mass. App. Ct. 432, 446 (2001) (collecting cases).

---

[116] Pl. SOF ¶ 149; Def. SOF ¶ 149.

Dr. O'Horo was hired into a new position as Director of Quality & Safety in IR.[117]  She was tasked with various duties, most of which remained intact throughout her employment.[118]  Other physicians and leaders shared responsibility with Dr. O'Horo for quality and safety within the IR Division, including Dr. Vilvendhan and Dr. Moses.[119]  Dr. O'Horo has outlined instances in which she maintains that her authority and position were overlooked and/or disrespected.  Even construing these allegations in the light most favorable to Dr. O'Horo, no reasonable jury would find that BMC constructively demoted Dr. O'Horo pursuant to state law.  For these reasons, Dr. O'Horo's constructive demotion claim should be dismissed.

ii.   Constructive Discharge

"Constructive discharge" usually refers to "harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is 'intolerable.'" Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 45 (1st Cir. 2003) (internal citations omitted).  To establish a constructive discharge, a plaintiff must "show that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign."  Id. (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002)). "The standard is an objective one; an employee's subjective perceptions do not govern."  Id.  "A plaintiff seeking to withstand summary judgment must point to evidence in the record showing that [intolerable working conditions] existed."  Gerald v. Univ. of P.R., No. 11–2143, 2013 U.S. App. LEXIS 1925, at * 44, 2013 WL 310396 (1st Cir. January 28, 2013).  "Absent some showing that gender-based discrimination polluted the workplace, . . . the constructive discharge claim must fail."  Ahern, 629 F.3d at 59.

---

[117] Def. SOF ¶¶ 4, 5; Pl. Resp. ¶¶ 4, 5.
[118] Def. SOF ¶ 8; Pl. Resp. ¶ 8; Pl. SOF ¶ 106; Def. Resp. ¶ 106.
[119] Def. SOF ¶¶ 9, 10; Pl. Resp. ¶¶ 9, 10.

24

Dr. O'Horo's constructive discharge claim is premised on the same nine events as the constructive demotion allegations.  Even construing the facts in the light most favorable to her, this Court finds that no reasonable jury would find that she was constructively discharged.

First, Dr. O'Horo overstates the evidence of record.  For example, she claims that she was excluded "entirely" from the process of developing the internal review when the Defendants have produced copies of emails soliciting her input.[120]  She also claims that she was scheduled to be observed seven more times than her male colleagues.  When questioned at oral argument, Dr. O'Horo's counsel could not explain how she had reached that number based on the evidence of record.  Rather, it appears that she was scheduled for four observations, Dr. Higgins was scheduled for two, Dr. Burch was scheduled for one, and Dr. Campos was scheduled for one.  See Docket No. 73-26 at 2-7.

Second, other allegations simply fail to satisfy the legal requirement of materially altering the conditions of Dr. O'Horo's employment.  Specifically, Dr. O'Horo has not shown that consultation and independent investigation of her concerns, particularly where there were overlapping areas of responsibility for patient safety, materially altered the conditions of her employment.  Dr. O'Horo acknowledged that part of her role was to develop quality and safety programs for the IR department, and this role was multifaceted.  In addition to developing and overseeing physician evaluation processes, she was tasked with developing an on-boarding program for new physicians, specifically the OPPE and FPPE programs, handling safety reports that were filed in a computer system called STARS, instituting quality and safety protocols, responding to concerns when a complication related to a procedure arose, and other matters related to quality and safety in the IR Division.[121]  Dr. O'Horo does not allege that the majority

---

[120] Pl. SOF ¶ 148; Def. Resp. ¶ 148.
[121] Def. SOF ¶ 8; Pl. Resp. ¶ 8; Pl. SOF ¶ 106; Def. Resp. ¶ 106.

of these tasks were taken from her, nor does she allege that she was, for example, relegated to menial and administrative tasks.  Moreover, other physicians and leaders at BMC shared responsibility with Dr. O'Horo for quality and safety within the IR Division.[122]

Considering the above, even construing the evidence in the light most favorable to Dr. O'Horo, no reasonable juror could find that Dr. O'Horo was constructively discharged, or indeed, subject to any adverse employment action on the basis of her gender.  Accordingly, this Court recommends that Judge O'Toole grant the Defendants' motion for summary judgment as to Dr. O'Horo's disparate treatment claim.

        b.    Hostile Work Environment

Dr. O'Horo also claims that she was subject to a hostile work environment.  Docket No. 80 at 22-25.

An employer violates Title VII when it requires an employee "to work in a discriminatorily hostile or abusive environment."  Valentin-Almeyda v. Municipality Of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (citation omitted).

The elements of a hostile work environment claim are as follows:[123]

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Id. (citation omitted).  "In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the

---

[122] Def. SOF ¶ 9; Pl. Resp. ¶ 9.
[123] The same legal standard applies to both federal and state hostile work environment claims. Ponte v. Steelcase Inc., 741 F.3d 310, 319 n.9 (1st Cir. 2014).

"frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Payne-Callender v. Gavin, No. CV 19-11286-RGS, 2021 WL 495079, at *3 (D. Mass. Feb. 10, 2021) (citation and internal quotation marks omitted).  "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment."  Id.

"[O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment to establish an objectively hostile or abusive work environment."  Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 43 (1st Cir. 2011) (citations and internal quotation marks omitted).  "[A] supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws." Id. (citations omitted).  In addition, "if a defendant's conduct is equally harsh towards men and women, there is no hostile work environment based on sex." Burns v. Johnson, 18 F. Supp. 3d 67, 75 (D. Mass. 2014) (citations and internal quotations omitted).

In support of her hostile work environment claim, Dr. O'Horo points to the following:[124]

_____

[124] With respect to hostile work environment claims "'incidents comprising a hostile work environment are part of one unlawful employment practice' and, in order to comply with the statute of limitations, 'the employee need only file a charge within [300] days of any act that is part of the hostile work environment.'"  Marrero, 304 F.3d at 18 (alteration in original) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002)).

> The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

- In the fall of 2018, while discussing safety-related issues concerning Dr. Higgins, Dr. Vilvendhan told Dr. O'Horo that Dr. Soto might listen to her because she was a woman.[125]

- At a meeting in early November 2019[126] to discuss safety concerns about Dr. Higgins, Dr. McAneny asked Dr. O'Horo, in a manner she perceived to be condescending, whether she would buy him a six-pack if he fixed the problem.[127]

- Dr. Higgins' routine condescension towards Dr. O'Horo in front of residents and staff members.[128]

- Dr. Moses' suggestion that she might be racist because of her continued complaints about Dr. Higgins.[129]

- Dr. Soto, Dr. Moses, and Dr. Davidoff's questioning and undermining Dr. O'Horo's complaints relating to Dr. Higgins.[130]

Docket No. 80 at 23-25.

While these facts, viewed in their totality, indicate an uncomfortable and at times tense working relationship, they are not sufficiently severe or pervasive to constitute a hostile work environment.  They do not rise to a level that would allow a reasonable jury to find that the alleged conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive.  The incidents described were not frequent in nature.  They were not severe.  They were not threatening.  They did not alter the bulk of Dr. O'Horo's day-to-day

---

Nat'l R.R., 536 U.S. at 117.  See also Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 40 (1st Cir. 2011) (same analysis for state law claims).  Accordingly, this Court may consider all acts alleged by Dr. O'Horo, including those outside the October 25, 2019 statute of limitations cutoff for disparate treatment events.

[125] Pl. SOF ¶ 112; Def. Resp. ¶ 112; Docket No. 73-1 at 13-14.

[126] Dr. O'Horo identifies this meeting as occurring "around th[e] same time" as a separate event which occurred in early November 2019.  See Pl. SOF ¶¶ 144, 145; Def. Resp. ¶¶ 144, 145.

[127] Pl. SOF ¶ 145; Def. Resp. ¶ 145.

[128] Pl. SOF ¶ 118.  Dr. O'Horo alleges this Dr. Higgins' problematic behavior was ongoing throughout her tenure at BMC.  Id.

[129] Pl. SOF ¶ 131.  The accusation of racism is not supported.  The supporting affidavit states that Dr. Moses accused Dr. O'Horo of targeting Dr. Higgins.  It says nothing about Dr. Higgins' race. Def. Resp. ¶ 131.

[130] Pl. SOF ¶ 135; Def. Resp. ¶ 135.

duties. There is no evidence of record that her overall work performance suffered. Accordingly, this Court recommends that Judge O'Toole grant the Defendants' motion for summary judgment as to Dr. O'Horo's hostile work environment claim.

### c. Aiding And Abetting Claim

Dr. O'Horo brings an aiding and abetting claim against Dr. Soto pursuant to M.G.L. c. 151B, § 4(5). That statute makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so." M.G.L. c. 151B, § 4(5). However, an aiding and abetting claim under § 4(5) "is entirely derivative of the discrimination claim." Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 122 (2000).

Because Dr. O'Horo's underlying gender discrimination claims do not survive summary judgment, her aiding and abetting claim does not either. Accordingly, this Court recommends that Judge O'Toole grant the Defendants' motion for summary judgment as to this claim.

### B. Whistleblower Claim[131]

Dr. O'Horo alleges that following her escalation of complaints regarding Dr. Higgins, BMC retaliated against her, resulting in her constructive discharge.

Pursuant to the Massachusetts' Health Care Whistleblower Act, a health care facility may not retaliate against a health care provider for objecting to or reporting, inter alia, conduct of the health care facility reasonably believed to endanger public health. M.G.L. c. 149 §§ 187(b)(3)

---

[131] Pursuant to M.G.L. c. 149 § 187, the statute of limitations for such claims is two years within which a plaintiff must institute a case. M.G.L. c. 149 § 187(d); see also Sawyer v. Kindred Healthcare, Inc., 186 F. Supp. 3d 118, 127 (D. Mass. 2016), aff'd, No. 16-1674, 2017 WL 11686099 (1st Cir. July 31, 2017). Accordingly, because this case was filed on December 29, 2020, all alleged conduct after December 29, 2018 is actionable.

and (4).[132]   To succeed on a retaliation claim under M.G.L. c. 149 § 187(b)(3), a plaintiff must

show that:

> (1) [s]he objected to, or refused to participate in, an activity, policy or practice, that
> (2) [s]he reasonably believed to be in violation of a law, rule, regulation, or
> professional standard of practice, (3) which [s]he reasonably believed posed a risk
> to public health, and (4) [s]he was retaliated against as a result.

United States ex rel. Karvelas v. Tufts Shared Servs., Inc., 433 F. Supp. 3d 174, 185-86 (D.

Mass. 2019) (citing Romero v. UHS of Westwood Pembroke, Inc., 72 Mass. App. Ct. 539,

(2008)).   Retaliation is defined as "the discharge, suspension, demotion, harassment, denial of a

promotion or layoff or other adverse action taken against a health care provider affecting the

terms and conditions of employment."  M.G.L. c. 149 § 187(a).

A whistleblower claim without direct evidence of retaliation is analyzed under a burden-

shifting framework similar to that outlined in McDonnell Douglas.  Fournier v. Massachusetts,

No. 20-2134, 2021 WL 4191942, at *4 (1st Cir. Sept. 15, 2021).[133]   In other words, plaintiff has

the burden of establishing a prima facie case of retaliation.  If she does, then the burden shifts to

the defendants to articulate a legitimate, non-retaliatory explanation for their actions.  If they do,

then plaintiff must show that the proffered explanation if a pretext for unlawful retaliation.  Id.

The Defendants concede, for the purposes of summary judgment, that Dr. O'Horo

engaged in protected activity.  Docket No. 65-1 at 20.  They argue, however, that the record does

not reflect any adverse employment action and further, even if an adverse action occurred, there

---

[132] Dr. O'Horo does not specify in her complaint which of the four categories give rise to her
claim.  In her memorandum, she asserts claims under §§ 187(b)(3) and (4).  Docket No. 80 at 26-
27.

[133] Fournier and other whistleblower cases cited below involve claims under M.G.L. c. 149 § 185
(the Whistleblower Act).  The language in the M.G.L. c. 149 § 187 (the Healthcare
Whistleblower Act) largely tracks the Whistleblower Act.  Clifford v. Williams, No.
BRCV2003-00682, 2008 WL 6858964 at *12 n.5 (Mass. Super. Dec. 30, 2008).  The only
differences relevant here are that the plaintiff under the healthcare statute must be a healthcare
provider and she must believe that there is a risk to the public health.

is no causal link between the protected activity and such action.  Id.

"A retaliatory connection between protected conduct and adverse employment action may be inferred where 'adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity.'"  Rodriguez v. Atrius Health Inc., No. 1984CV251, 2021 WL 6335691, at *7 (Mass. Super. Nov. 11, 2021) (quoting Mole v. University of Mass., 442 Mass. 582, 592 (2004)).  Temporal proximity alone, however, is generally insufficient to establish a causal connection.  Ralph v. Town of Dedham, 102 Mass. App. Ct. 1104 at *3 (2022).  Rather, a plaintiff must show that a retaliatory animus was a "determinative" or "but for" cause of an adverse employment action even if it was not the only cause.  Edwards v. Commonwealth of Mass., 488 Mass. 555, 571 (2021).

It is undisputed that Dr. O'Horo, from early on in her tenure at BMC, complained to Dr. Soto about Dr. Higgins' lack of technical abilities and unsafe behavior during procedures.[134]  In January 2019, Dr. O'Horo elevated her complaints to Dr. Moses.[135]  On September 13, 2019, Dr. O'Horo sent the Whistleblower Letter to Dr. Davidoff and Mr. Friedman.[136]  Dr. O'Horo points to certain events, which she contends occurred shortly thereafter, to show adverse employment action: she was (1) denied a visiting professorship; (2) passed over for selection as the Medical Student Clerkship Director and Director of Early Specialization in IR; and (3) constructively discharged.  Docket No. 80 at 27-28.

The evidence of record, however, shows that Dr. Campos was not awarded a visiting professorship.  Rather, he was invited to a two-day meeting in Argentina on October 3 and 4,

---

[134] Def. SOF ¶ 14; Pl. Resp. ¶ 14; Pl. SOF ¶ 115; Def. Resp. ¶ 115.
[135] Def. SOF ¶ 24; Pl. Resp. ¶ 24.
[136] Def. SOF ¶ 34; Pl. Resp. ¶ 34.

2019.  Docket No. 67-1 ¶ 7.  Moreover, the invitation was extended to Dr. Campos in 2018, well

before Dr. O'Horo escalated her complaints or wrote the Whistleblower Letter.  Id.

As to Dr. O'Horo's failure to obtain the two directorships, she has not adduced sufficient

evidence to sustain her burden to show that such acts constituted adverse employment actions.

She has not provided any evidence to show the relevant position of these directorships in the

employment hierarchy of BMC or BUMCR.  Nor has she provided any information as to how

these positions interacted with her own.  The only evidence of record shows that these positions

were distinct from and in addition to Dr. O'Horo's role as Director of Quality & Safety in IR.

They did not come with separate stipends.[137]  The positions afforded the recipients one academic

day per week, which Dr. O'Horo already had by virtue of her position.[138]  Her compensation was

not altered.  Her underlying responsibilities did not change.  Even assuming Dr. O'Horo's

version of the facts is true – that she was passed over for two other titles within IR – that is

simply insufficient to show that the terms or conditions of her own employment were altered.[139]

Finally, Dr. O'Horo cannot establish that she was constructively discharged.  A

constructive discharge in the context of a whistleblower claim "occurs when the employer's

conduct effectively forces an employee to resign.'"  Armato v. Town of Stoneham, 100 Mass.

App. Ct. 1134 at (2022) (quoting GTE Prods. Corp. v. Stewart, 421 Mass. 22, 33-34 (1995)).

"The standard requires a finding, 'based on an objective assessment of the conditions under

which the employee has asserted [s]he was expected to work,' that the conditions 'were so

difficult as to be intolerable.'"  Armato, 100 Mass. App. Ct. 1134 at *4 (emphasis in original).

---

[137] Def. SOF ¶¶ 73, 74; Pl. Resp. ¶¶ 73, 74.
[138] Pl. SOF ¶ 141; Def. Resp. ¶ 141.
[139]  Defendants assert that the award of these directorships does not constitute an adverse action because O'Horo never applied for either one.  Docket No. 75 at 9-10.  However, Dr. Higgins did not apply for the Medical Student Clerkship Director position.  See Pl. SOF ¶ 139; Def. Resp. ¶ 139.

Such conditions were not present here, and Dr. O'Horo's own actions as evidenced by texts and emails show that she voluntarily resigned.[140]  While her formal letter announcing her departure to BMC stated that she was "constructively discharged," her text to a fellow doctor states that she "resigned today."[141]  Dr. O'Horo also wrote to a different colleague: "Picked a perfect time to exit."[142]  She made clear to others that she was intentionally delaying her departure (and notification of the same) because she was hoping BMC would fire her.[143]  Even after obtaining a new position, she waited multiple weeks to announce her departure because it might help her legal case and benefit her financially.[144]  Accordingly, Dr. O'Horo has not made a prima facie showing.

Even if she had, the Defendants have articulated legitimate, non-retaliatory reasons for their actions.  With respect to the directorships, they have established that the positions had "less financial support than Dr. O'Horo's position . . . so had Dr. O'Horo accepted [them], it would have constituted a demotion and loss of supplemental compensation."[145]  Further, with respect to Dr. Higgins holding two positions, the Defendants note that Dr. Higgins was the only attending interventional radiologist left at BMC in mid-2020, well after Dr. O'Horo's departure.[146]  Accordingly, the Defendants have offered legitimate, non-retaliatory reasons for their actions which Dr. O'Horo alleges are adverse.

Even if they had not, O'Horo must still show that the proffered explanations are a pretext for unlawful retaliation.  Specifically, she must show that a discriminatory animus was a

---

[140] Def. SOF ¶¶ 82-96; Pl. Resp. ¶¶ 82-96.
[141] Def. SOF ¶¶ 92, 93; Pl. Resp. ¶¶ 92, 93.
[142] Def. SOF ¶ 93; Pl. Resp. ¶ 93.
[143] Def. SOF ¶ 89; Pl. Resp. ¶ 89.
[144] Id.; Def. SOF ¶¶ 91, 92; Pl. Resp. ¶¶ 91, 92.
[145] Docket No. 67-13 at 3.
[146] Def. Resp. ¶ 140.

"determinative" or "but for" cause for the adverse employment action. <u>Edwards</u>, 488 Mass. at 571-73.

Here, Dr. O'Horo relies heavily on temporal proximity between her protected conduct and the alleged adverse actions. Docket No. 80 at 28. When an adverse employment action closely follows protected conduct, a court should consider whether the sequence and proximity can establish that the employer's justification is pretextual. <u>Fournier</u>, 2021 WL 4191942, at *4. In this case, however, any reasonable inference that can be drawn from the proximity of events is substantially undercut by the other evidence in the record that shows that the Defendants respected, took seriously, and acted on Dr. O'Horo's allegations about patient safety.

For example, on June 8, 2018, Dr. O'Horo raised ongoing concerns about Dr. Higgins to Dr. Soto and suggested that his procedures be observed. Dr. Soto responded: "Thank you for your diligence and hard work. I suggest we meet (hopefully Monday) to discuss . . . ."[147] Without elaboration, Dr. O'Horo characterized this response as insincere.[148] Nevertheless, in accordance with Dr. O'Horo's recommendation, Dr. Soto and Dr. O'Horo devised a plan to shadow Dr. Higgins.[149] On September 13, 2019, the same day that Dr. O'Horo sent the Whistleblower Letter, Dr. Davidoff responded that "[w]e take this type of information and report very seriously."[150] Dr. Davidoff testified that BMC quickly went to work to develop an action plan in response to Dr. O'Horo's concerns.[151] Dr. Davidoff then met with Dr. O'Horo, and it is undisputed that he listened attentively and promised to follow up.[152] On October 3, 2019, there was a further meeting with Dr. O'Horo and other individuals responsible for patient safety to

---

[147] Def. SOF ¶ 14; Pl. Resp. ¶ 14.
[148] <u>Id.</u>
[149] Def. SOF ¶ 15; Pl. Resp. ¶ 15.
[150] Def. SOF ¶ 35; Pl. Resp. ¶ 35.
[151] <u>Id.</u>
[152] Def. SOF ¶ 36; Pl. Resp. ¶ 36.

discuss each of Dr. Higgins' cases identified by Dr. O'Horo.[153]  It is undisputed that after the meeting, Dr. O'Horo felt optimistic that her concerns would be addressed.[154]  On December 7, 2019, Dr. O'Horo filed a complaint with DPH alleging that BMC failed to adequately report complications caused by Dr. Higgins.[155]  By letter dated January 16, 2020, BMC received a proposal from an outside consultancy, the Greeley Company, to conduct an external peer review of the IR division.  Docket No. 73-16.  It is undisputed that the review consisted of cases that Dr. O'Horo had identified, as well as other cases performed by IR physicians in which complications arose.[156]  On January 23, 2020, DPH informed BMC that the complaint was unsubstantiated but nevertheless in an exit interview identified opportunities to improve services in IR.[157]  The Greeley Company completed its review in April 2020, after Dr. O'Horo's departure.[158]

Dr. O'Horo has not produced sufficient evidence to establish that the defendants took action against her, let alone adverse action, because of her protected activity.  Indeed, they addressed her concerns and continued to do so even after she left.  It is undisputed that Dr. O'Horo took issue with how BMC conducted its investigation of her allegations, but they did take them seriously and investigated them, including by hiring an outside consultant.  For all of these reasons, Dr. O'Horo has not put forth sufficient evidence, even when considered as a whole, that would enable a reasonable factfinder to conclude that the Defendants' stated reasons for their actions were pretextual or that the real reason for their actions was retaliatory animus.

Accordingly, I recommend that Judge O'Toole grant the Defendants' motion for summary judgement as to Dr. O'Horo's whistleblower claim.

---

[153] Def. SOF ¶ 37; Pl. Resp. ¶ 37.
[154] Id.
[155] Def, SOF ¶ 46; Pl. Resp. ¶ 46.
[156] Def. SOF ¶ 45; Pl. Resp. ¶ 45.
[157] Def. SOF ¶¶ 48, 52; Pl. Resp. ¶¶ 48, 52.
[158] Pl. SOF ¶ 150; Def. Resp. ¶ 150.

V.  <u>RECOMMENDATION</u>

For the foregoing reasons, I recommend that Judge O'Toole grant the Defendants' motion for summary judgment in its entirety.

VI.  <u>REVIEW BY DISTRICT JUDGE</u>

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within fourteen days of service of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  <u>See</u> Fed. R. Civ. P. 72.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  <u>See</u> <u>Phinney v. Wentworth Douglas Hosp.</u>, 199 F.3d 1 (1st Cir. 1999); <u>Sunview Condo. Ass'n v. Flexel Int'l, Ltd.</u>, 116 F.3d 962 (1st Cir. 1997); <u>Pagano v. Frank</u>, 983 F.2d 343 (1st Cir. 1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge